NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0419n.06
Filed: May 20, 2005

No. 03-3699

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

MILAN LJULJDJUROVIC;
JELKA LJULJDJUROVIC,

      Petitioners-Appellants,

      v.

ALBERTO R. GONZALES,
ATTORNEY GENERAL,

      Respondent-Appellee.

On Review from the Board
of Immigration Appeals

---

**Before:**     **BOGGS, Chief Judge; CLAY, Circuit Judge; WALTER, District Judge**[*]

**WALTER, District Judge.** Petitioners-Appellants, Milan Ljuljdjurovic (hereinafter "Milan") and Jelka Ljuljdjurovic (hereinafter "Jelka"), appeal from a decision of the Board of Immigration Appeals denying the their motion to remand, upholding the Immigration Judge's denial of asylum, withholding of removal, and denial of voluntary departure.

At their initial immigration hearing, where they were charged with remaining in the United States longer than permitted, the Ljuljdjurovics admitted doing so, conceded removability, and requested asylum and withholding of removal, or in the alternative, voluntary departure. The Ljuljdjurovics ultimately decided to go forward on the basis of Milan's asylum

---

[*]The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

application, rendering Jelka's request derivative of Milan's.

After a hearing on the merits of Milan's asylum application, Immigration Judge Robert D. Newberry ("the IJ") issued an oral decision dated June 21, 1999. He denied the application for asylum and withholding of removal on the grounds that it was not supported by credible evidence; and that, even if credible, the evidence presented by the Ljuljdjurovics was insufficient to demonstrate asylum eligibility. The judge also denied the Ljuljdjurovics' request for voluntary departure as an alternative to removal. Accordingly, the IJ ordered the Ljuljdjurovics removed to Yugoslavia.

The Ljuljdjurovics appealed the IJ's decision to the Board of Immigration Appeals ("the BIA"). The BIA applied the summary affirmance procedure available to it under 8 C.F.R. § 1003.1(e)(4), and "affirm[ed] without opinion, the results of the [IJ's] decision." On April 16, 2003, the BIA issued a final removal order as to both Milan and Jelka. The Ljuljdjurovics argue that the Immigration Judge abused his discretion in finding that the their application was not supported by credible evidence; and that, even if credible, the evidence presented by the them was insufficient to demonstrate asylum eligibility. They also argue that the BIA violated its own regulations by affirming without opinion the decision of the IJ. This Court disagrees, and the decisions of the BIA and IJ are therefore AFFIRMED.

## I.

Milan, age 37, and Jelka, age 35, are both natives and citizens of the former Yugoslavia. Their daughter, Ivana, was born in the United States on March 21, 1996. Mr. and Mrs. Ljuljdjurovic entered the United States, for pleasure, as B-2 non-immigrant visitors on December 14, 1994, but remained without authorization beyond the December 13, 1995 expiration date of their visas.

Milan was born and lived in Podgorica, Yugoslavia, formerly Titograd, Montenegro, Yugoslavia, all of his life until coming to the United States. He completed high school and two years of college before being drafted into the Yugoslav army. Milan's father is Albanian and his mother is Serbian. He classifies himself as Albanian. The first part of his surname, "Lluljd," is Albanian, and the second part, "ovich," is Serbian. Milan testified that because of his surname he is identified by fellow Serbs as an Albanian. Milan also testified that he is a practicing Catholic, although he said he rarely attended church because of the need to "camouflage" his religion in order to avoid harassment by his neighbors.

Milan completed a year of military service in August 1986. He was recalled to active duty three times. He was first recalled to fight in the war in Slovenia in May 1990 or 1991. Milan testified that the situation in the army when he reported for duty was chaotic, with more troops reporting than the army could arm, clothe, or feed. After a few days, the captain in charge of the barracks told Milan and several other soldiers belonging to ethnic minorities that "terrible things are happening in the army" and that they should try to leave unnoticed. Milan did leave, and returned home.

In July 1991, by which time war had broken out in Croatia, Milan received a second recall notice. He testified that the atmosphere in the army was hostile to minority soldiers, with drunken threats to "butcher" minority troops made by Serbian nationalist soldiers, and that "[v]ery soon it became the official policy that all the soldiers from other ethnic groups should be interrogated and their patriotism tested. It was assumed that we were traitors." After eight days, Milan's commanding officer told the troops to either prepare to go to war in Croatia, or to leave their weapons and depart if they disagreed with the war. Milan testified that he left his weapon

and departed, because he "did not want to be part of a nationalistic and aggressive army." He also testified that despite his commander's ultimatum, he did not leave the army with official permission. Soon after leaving the army for the second time, Milan was visited by the military police and summoned to appear in military court for desertion, for leaving the army the first time. After the commanding officer who released him submitted an affidavit confirming Milan's version of events, he was released.

Several months later, he was court-martialed for desertion for leaving the army the second time. He defended himself on the grounds that the war was a war of aggression, and that his failure to serve did not undermine Serbia's ability to defend itself. After Milan appeared in court, he was told he would receive another summons but never did. He testified that he does not know the status of that case, whether he was convicted, or still faces charges. He stated that he believes the government was too busy with other matters at the time to issue summonses or decisions against deserters.

In early 1994, Milan was recalled a third time, this time to fight in Bosnia. He did not report. He testified that the reason for his refusal to serve was his belief that the war was immoral. He also testified that by this time the military was becoming increasingly dominated by Serbian nationalists and para-military elements, and that he would not feel safe, as an Albanian, serving with Serbs.

According to Milan's relatives in Serbia, he has received two additional summonses from the army since he left for the United States. Milan's relatives reported that the military police came to their house looking for Milan, not believing he had left the country.

Milan testified that he and Jelka were married on August 21, 1994, after having known each other for four years. She testified that she first met him in 1988 and started dating him

about 1990. Milan testified that they were married by a county official in a government office, and had a reception in the backyard of his parents' home attended by approximately 30 people.

Jelka is an ethnic Montenegrin, who practices the Serbian Orthodox religion. Milan testified that his family was opposed to his dating Jelka because of her ethnic background, and that they were reluctant to marry because they felt they would face hostility from both the Albanian and Orthodox communities, which were opposed to mixed marriages, on top of the hostility Milan already experienced from Serbs as a result of his Albanian heritage. Neither the Orthodox nor Catholic churches would marry them. Milan testified that his mixed marriage hurt his accounting business because clients would no longer do business with him, and that, after a bank refused to extend credit to him because of his Albanian extraction, he had to close his business. He testified that his mother had to stop working due to harassment about his mixed marriage, and that his sister was attacked and robbed as a result of her own mixed marriage. Jelka was insulted on the street, and, according to her testimony, the two of them were denied a room in a hotel due to Milan's Albanian last name.

Jelka also testified that they received approximately four threatening phone calls per week after their marriage, and that the police took no action when she reported these calls. She testified that she had not kept a copy of the receipt she was given after filing her complaint about the calls. She claims to have been fired from her job as a bookkeeper and accountant after returning from her honeymoon because she married an Albanian, and that she filed an employment discrimination complaint without success. She testified that such complaints are submitted on a form filled out at the appropriate government agency offices, and that she was not given a copy of her complaint, but only a case number that she memorized.

Shortly after their marriage, the Ljuljdjurovics began looking for a way to leave

Montenegro. Jelka testified that their desire to leave was due to the persecution that they claim to have suffered, and because they did not want to raise a child in that hostile atmosphere. They began trying to leave for either the United States or Germany, because they had connections that would help them with regard to both destinations. Eventually, they received visas to travel to the United States through a connection in the government.

## II.

The IJ ruled on three claims for relief. He ruled that the Ljuljdjurovics were not eligible for asylum or withholding of removal, and they were not entitled, in the alternative, to voluntary departure. The Ljuljdjurovics do not appeal the IJ's denial of voluntary departure. That issue is therefore waived. *See Ramant v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004).

Asylum can be granted by the Attorney General and, by delegated authority, the BIA and any IJ. *See Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). A refugee is an alien who is "unable or unwilling to return to . . . [his] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Therefore, the BIA or an IJ must first decide if someone is a refugee under § 1101(a)(42)(A) and then decide whether or not to grant asylum. *See Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003). In this case, the IJ decided that the Ljuljdjurovics were not refugees and thus never reached the second step. Under § 1101(a)(42)(A), an applicant has the burden of proving past persecution or a well-founded fear of future persecution. 8 C.F.R. § 208.13(a)-(b); *see also Yu*, 364 F.3d at 703.

The grounds for withholding of removal are the same as the ones used for asylum, except that instead of proving a "well-founded fear of persecution," 8 C.F.R. § 208.13(b), the applicant "must demonstrate a clear probability that he would be subject to persecution." *Mikhailevitch v.*

*INS*, 146 F.3d 384, 391 (6th Cir. 1998). Therefore, the Ljuljdjurovics face the same question, just with "a more stringent showing of truth." *Ibid.* So a determination that the Ljuljdjurovics are not eligible for asylum forecloses discussion of withholding of removal. *Ibid.*

The standard of review for these proceedings is extremely deferential to the finder of fact. The IJ's determination of the Ljuljdjurovics' refugee status is reviewed under a substantial evidence test. This court can reverse only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Yu*, 364 F.3d at 703 n.2 (recognizing lingering confusion over the proper standard but "officially adopt[ing]" substantial evidence).

The Ljuljdjurovics raise three grounds for reversal on appeal. First, they claim that the IJ lacked sufficient evidence for his credibility determination. Second, they claim that he lacked sufficient evidence for his determination that the Ljuljdjurovics' evidence was, even if true, insufficient to demonstrate asylum eligibility. Third, they claim that the BIA violated its own regulations by affirming without opinion the decision of the IJ.

The persecution claimed by the Ljuljdjurovics falls, broadly speaking, into two categories: persecution relating to Milan's desertion and refusal to serve in the military; and persecution relating to the Ljuljdjurovics' mixed marriage.

With regard to the Ljuljdjurovics' mixed marriage, the IJ stated that the loss of customers, inability to secure a loan, decision to close a business for lack of customers, being ostracized by friends, losing one's job, and receiving threatening phone calls constitute at most discrimination, not persecution. This Court agrees.

The IJ's determination that the Ljuljdjurovics' economic suffering did not rise to the level of persecution is supported by substantial evidence. The term "persecution" in the

definition of a refugee under the Act means harm or suffering that is inflicted upon an individual

in order to punish him for possessing a belief or characteristic a persecutor seeks to overcome.

*Matter of Acosta*, 19 I. & N. Dec. 211, 223 (BIA 1985), *overruled on other grounds by Matter of*

*Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987).  Although economic deprivations or restrictions

can constitute such persecution, they must be "so severe that they constitute a threat to an

individual's life or freedom."  *Id.* at 222; *see also Daneshvar v. Ashcroft*, 355 F.3d 615, 624 (6th

Cir. 2004) ("Economic deprivation constitutes persecution only when the resulting conditions are

sufficiently severe.")  (citing *Acosta*).

The Ljuljdjurovics presented evidence that Milan had to close his business after

customers deserted him and a bank denied him credit, and that Jelka was fired from her job and

forced to take work as a cleaner for which she was overqualified, but these privations do not rise

to the type of economic persecution that the BIA or the courts have found to necessary to justify

asylum.  *Compare, e.g.*, *Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir. 2003) ("That Nagoulko

was fired from her job as a kindergarten teacher because of her religious beliefs, while

discriminatory, is not the type of economic deprivation that rises to the level of persecution.

Nagoulko found steady work at the furnace factory for seven years after she was fired from her

teaching job.") *with, e.g.*,  *Chand v. INS*, 222 F.3d 1066, 1074 (9th Cir. 2000) (finding past

persecution where, in addition to physical abuse, applicant and his family were repeatedly

robbed and forced to vacate their home) *and Gonzalez v. INS*, 82 F.3d 903, 910 (9th Cir. 1996)

(finding past persecution where, in addition to violence committed against the applicant's family

and threats made to her, family land had been seized and the applicant's ration card and her

business's ability to buy inventory were taken away).  The threats received by the Ljuljdjurovics,

their inability on one occasion to obtain a hotel room, and ostracism by their friends may also

have constituted discrimination, but discrimination, however odious it may be, is not

persecution. *Bucur v. INS*, 109 F.3d 399, 402 (7th Cir. 1997).

    With regard to Milan's desertion and refusal to serve in the military, the IJ stated that

Milan had failed to meet his burden of proof under *Matter of A-G-*, 19 I. & N. Dec. 502 (BIA

1987), to show the required persecution for his military service or failure to attend his military

service. This Court agrees. The requirement of military service is not in itself persecution. *A-

G-*, 19 I. & N. Dec. at 506. The *Handbook on Procedures and Criteria for Determining Refugee

Status*, United Nations High Commissioner for Refugees (Geneva 1979) (the "Handbook") states

that

> Not every conviction, genuine though it may be, will constitute a
> sufficient reason for claiming refugee status after desertion or
> draft-evasion. It is not enough for a person to be in disagreement
> with his government regarding the political justification for a
> particular military action. Where, however, the type of military
> action, with which an individual does not wish to be associated, is
> condemned by the international community as contrary to basic
> rules of human conduct, punishment for desertion or draft-evasion
> could, in the light of all other requirements of the definition, in
> itself be regarded as persecution.

Handbook ¶¶ 170-71.

    After completing a year of compulsory military service, Milan was recalled to duty three

times. In May 1990 or 1991, to fight in the war in Slovenia; in July 1991, for the war in Croatia;

and in February or March 1994, for the war in Bosnia. During the war in Slovenia, Milan left

the army after the barracks captain told him to leave. Milan was summoned to appear in military

court for this desertion; however, he was released after the barracks captain submitted an

affidavit. Milan again left the army when he was recalled for the war in Slovenia. Milan was

court-martialed for this desertion. After appearing in court for this desertion, he was told that he

would receive another summons, but he never did. Milan did not report to the army when he

was called to fight in Bosnia. According to his family, Milan received two additional summonses since he left for the United States.

The IJ's finding that, even if all of the evidence concerning Milan's military service is credited as true, he has not established persecution is supported by substantial evidence. Milan has not produced evidence of past persecution for deserting the army. Because Milan has not sustained his burden of establishing past persecution, he is not entitled to the presumption under 8 C.F.R. § 208.13(b)(1)(i) of a well-founded fear of future persecution. Therefore, Milan retained the burden on this issue.

Milan testified that he was summoned and appeared in court for two of the three desertions. After the first desertion, he was released. After the second desertion, he was told he would receive another summons, but never did. Milan has never appeared in court for the final desertion. According to his family, he received two additional summons in the nine years he has been living in the United States. The IJ did not find this evidence sufficient to establish a well-founded fear of future persecution.

In order to reverse the IJ's determination on this issue, which was ultimately adopted by the BIA, this Court would have to decide that the evidence would compel a reasonable factfinder to conclude that there is a reasonable possibility of Milan suffering future persecution if he were to return to Yugoslavia. 8 C.F.R. § 208.13(b)(2). Under these circumstances, this Court is unable to overturn the IJ's decision.

This Court need not consider the issue of the IJ's credibility determination because we have found that the IJ had substantial evidence to deny asylum, without relying on that issue. Nor need we address the claim that the BIA violated its own regulations by affirming the IJ without opinion. No practical purpose would be served by remanding this case back to the BIA

for a decision once we have rendered a decision on the merits of the IJ's decision.  Therefore, the

decisions of the BIA and IJ are AFFIRMED.