RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0004p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NANCY MAROUF; SAED MAROUF; NEHEDA MAROUF,

*Petitioners,*

*v.*

No. 14-4136

LORETTA E. LYNCH, Attorney General,

*Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A 088 534 580–582.

Argued: October 7, 2015

Decided and Filed: January 6, 2016

Before: MERRITT, McKEAGUE, and WHITE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Ann F. Barhoum, LAW OFFICES OF SHAMIEH AND TERNIEDEN, San Francisco, California, for Petitioners. Jamie M. Dowd, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Elias Z. Shamieh, LAW OFFICES OF SHAMIEH AND TERNIEDEN, San Francisco, California, for Petitioners. Jamie M. Dowd, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

MERRITT, J., delivered the opinion of the court in which McKEAGUE and WHITE, JJ., joined in part. McKEAGUE, J. (pg. 23), delivered a separate opinion concurring in the judgment. WHITE J. (pg. 24), delivered a separate opinion concurring in the judgment.

1

---

**OPINION**

---

MERRITT, Circuit Judge.   In this immigration case, petitioners Nancy Marouf, Saed Marouf, and Naheda Marouf seek review of the Board of Immigration Appeals' order affirming the decision of an Immigration Judge denying their applications for asylum, withholding of removal, and protection under the Convention Against Torture.   The Board of Immigration Appeals ("the Board") affirmed the Immigration Judge's ("IJ") finding that the Maroufs were not credible witnesses, and that they therefore failed to demonstrate a well-founded fear of persecution.   The Maroufs contend that the Board's adverse credibility determination was not supported by substantial evidence.   We agree, and **REVERSE** and **REMAND** to the Board for further proceedings consistent with this opinion.

## I.  Facts and Procedural History

Nancy and Saed Marouf, and their daughter Naheda, are stateless Christian Palestinians. Administrative Record ("A.R.") 99.   The family lived in the small West Bank village of Taybeh, about thirty minutes from Jerusalem.   A.R. 720.   Saed arrived in the United States from Taybeh in June 2008.   A.R. 56.   Nancy and Naheda arrived in September 2009.   *Id.*   Saed and Nancy now have two additional children who were born in the United States.   A.R. 99.

In October 2009, Nancy completed an application for asylum and withholding of removal, naming Saed and Naheda as derivative beneficiaries.   A.R. 704-18.   Saed and Naheda filed their own applications in the summer of 2011.   A.R. 833-42, 875-84.   The Maroufs were placed in removal proceedings in March 2010 and charged with being unlawfully present in the United States.   A.R. 820-21.

Hearings before IJ Robert Newberry were held in Detroit on several dates in 2011 and 2012.   A.R. 101-454.   The Maroufs claimed that they had been persecuted in the Occupied Territories as a result of their Christian religion.   *Id.*   Nancy and Saed each testified about numerous instances of persecution.   *Id.*

One such incident involved Saed being attacked in 2006 by a group of Muslims after he had escorted a group of young Christian women who were being harassed by Muslim men. *E.g.* A.R. 271-72. A large group of Muslims came to the house where Saed was staying and beat him and Nancy's cousin. *Id.* Saed's nose was broken in the incident, and Nancy's cousin also suffered an injury. *E.g.* A.R. 395.

The family also claimed that Muslim men attempted to rape Nancy in 2009, A.R. 421-22, and that Muslims fire-bombed Nancy's parents' house in March 2009, A.R. 156, 184. There was also testimony about the 2005 burning of the house of a Christian neighbor who had married a young Muslim woman from a nearby village. A.R. 422-23.

The IJ denied relief on April 5, 2013. A.R. 55-100. The IJ found the Maroufs to be stateless and ordered them removed to Israel and the Occupied Territories or, in the alternative, to Jordan. A.R. 99. The IJ concluded that Nancy and Saed's testimony was not credible and failed to demonstrate either a well-founded fear of persecution (the standard for asylum) or that it was more likely than not that they would be harmed (the standard for withholding of removal and protection under the Convention Against Torture) if returned to the Occupied Territories or Jordan. *Id.* The IJ therefore denied the Maroufs' applications for asylum, withholding of removal, and protection under the Convention Against Torture. A.R. 99-100. In support of his determination, the IJ pointed to various alleged discrepancies in the Maroufs' account.

Chief among these were translated statements by Nancy that referred to Saed's nose as having been broken in February 2007, as opposed to the February 2006 date referred to elsewhere. A.R. 78-79. The IJ was also troubled by a translated letter from Saed's mother that referred to his nose having been broken "in an accident," A.R. 82, and the apparent "variance" in Saed stating both that he was attacked by 40 Muslims and that at the time of the attack there were "more than 100 people" outside his house. A.R. 82-83. Varying statements about the injury Nancy's cousin suffered during the incident when Saed was attacked (whether he hurt his hand, arm, or shoulder) also raised concerns. *Id.*

On appeal, the Board affirmed the IJ's adverse credibility determination, holding that it was not clearly erroneous. A.R. 3-4. The Board recited the discrepancy in the dates given for the alleged attack on Saed, the discrepancies in the proffered nature of Nancy's cousin's injury,

the apparent discrepancy in how many persons attacked Saed, and the letter from Saed's mother stating that his nose had been broken in "an accident." *Id.*

The Maroufs now appeal the Board's adverse credibility determination and resulting denial of relief. A panel of this court issued an order in February 2015 granting the Maroufs' motion for a stay of removal pending their petition for review. Order of Feb. 10, 2015.

## II. Discussion

### A. Refugee Relief Framework

American immigration law provides three primary forms of relief for aliens at risk of persecution if returned to their home countries: withholding of removal under the I.N.A., 8 U.S.C. § 1231(b)(3); withholding of removal under the United Nations Convention Against Torture ("CAT"), as provided in 8 C.F.R. §§ 208.16-18; and asylum under 8 U.S.C. § 1158.

"To prevail on a petition for withholding of removal under the INA, [§ 1231(b)(3)], an alien must show that it is more likely than not that he would be subject to persecution . . . were he removed from this country." *Shkulaku-Purballori v. Mukasey*, 514 F.3d 499, 503 (6th Cir. 2007) (citations and internal quotation marks omitted). "[T]o be eligible for withholding of removal under the Convention, [an] applicant [must show] it is more likely than not that he . . . would be tortured if removed . . . ." *Id.* (citations and internal quotation marks omitted). These forms of relief are mandatory, provided that the applicant has not rendered himself statutorily ineligible for them. *See* 8 U.S.C. § 1231(b)(3)(A)[1] ("[subject to enumerated exceptions,] the

---

[1] 8 U.S.C. § 1231(b)(3), titled "Restriction on removal to a country where alien's life or freedom would be threatened," provides in pertinent part:

(A) In general

Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

(B) Exception

Subparagraph (A) does not apply to an alien deportable under section 1227(a)(4)(D) of this title or if the Attorney General decides that--

Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion . . . ."); 8 C.F.R. § 208.16(c)(4) ("If the immigration judge determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture.").

Asylum under 8 U.S.C. § 1158 is generally available for applicants who meet the definition of refugee under 8 U.S.C. § 1101(a)(42)(A), which requires only a well-founded fear of persecution:

> The term "refugee" means . . . any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

Unlike withholding of removal, asylum is discretionary relief. 8 U.S.C. § 1158(b)(1)(A) ("The Secretary of Homeland Security or the Attorney General *may* grant asylum . . . [if] such alien is a refugee within the meaning of section 1101(a)(42)(A) . . . .") (emphasis added).

Although asylum is discretionary, it nonetheless serves a vital role in America's system for protecting refugees from persecution. Indeed, the current asylum regime provided for in 8 U.S.C. § 1158 was originally enacted as part of the Refugee Act of 1980, Pub. L. No. 96-212, §208(a), 94 Stat. 102, 105 (1980), which the Supreme Court has repeatedly recognized as carrying out the United States' international treaty obligations regarding refugees:

---

(i) if the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion;

(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

(iii) there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or

(iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.

As this Court has twice recognized, one of Congress' primary purposes in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6224, T.I.A.S. 6577 (1968), as well as the United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), reprinted in 19 U.S.T. 6259.

*Negusie v. Holder*, 555 U.S. 511, 520 (2009) (citations and internal quotation marks omitted); *see also I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999); *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987).

Moreover, discretionary denials of asylum are "unusual" and "exceedingly rare." *Huang v. I.N.S.*, 436 F.3d 89, 90, 92 (2d Cir. 2006); *see also Gulla v. Gonzales*, 498 F.3d 911, 916 (9th Cir. 2007) ("It is rare to find a case where an [Immigration Judge] finds a petitioner statutorily eligible for asylum and credible, yet exercises his discretion to deny relief."). The grounds upon which asylum can be discretionarily denied to an otherwise-eligible applicant appear in practice to be limited to cases of "egregious conduct by the applicant," such as criminal convictions or fraud. *Zuh v. Mukasey*, 547 F.3d 504, 507 (4th Cir. 2008). Examples of reasons for discretionary denials upheld on appeal include multiple drunk driving convictions, *Kouljinski v. Keisler*, 505 F.3d 534, 542-43 (6th Cir. 2007), visa fraud, *Aiqin Xue v. Holder*, 538 F. App'x 35, 36-37 (2d Cir. 2013), marriage fraud, *Singh v. Holder*, 568 F. App'x 512 (9th Cir. 2014), multiple convictions for counterfeiting and disorderly conduct, *Barrie v. Gonzales*, 228 F. App'x 66, 69 (2d Cir. 2007), multiple burglary convictions, *Kazlauskas v. I.N.S.*, 46 F.3d 902, 904-07 (9th Cir. 1995), and a history of seven convictions, most for drug crimes, *Dhine v. Slattery*, 3 F.3d 613, 615-20 (2d Cir. 1993).

## B. Relevant Standards of Review

When reviewing a removal order denying asylum or withholding of removal, factual findings of the IJ and Board — including adverse credibility determinations — are reviewed for "substantial evidence," *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011), and "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). If administrative findings are supported by substantial evidence, the adverse credibility determination is entitled to deference

regardless whether the inconsistencies "bear on the heart" of a petitioner's claims. *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). However, under the substantial evidence standard, "speculation and conjecture cannot form the basis of an adverse credibility finding." *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005) (citation and internal quotation marks omitted): *Vasha v. Gonzales*, 410 F.3d 863, 869 (6th Cir. 2003). "[W]hen evaluating credibility, an IJ should be sensitive to misunderstandings caused by language barriers, the use of translators, and cultural differences." *Reyes-Cardona v. Holder*, 565 F. App'x 366, 367 (6th Cir. 2014) (per curiam) (citing *Iao v. Gonzales*, 400 F.3d 530, 532 (7th Cir. 2005)); *see also Mapouya v. Gonzales*, 487 F.3d 396, 407-09 (6th Cir. 2007) (noting in regard to the IJ's conclusion that petitioner's accounts were inconsistent, "this alleged inconsistency is unsupported by the record evidence; the IJ had to impute meaning that was most likely the result of an erroneous translation, and he drew that meaning by 'speculation and conjecture' based on general evidence of warfare in Congo at the time."); *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004) (observing that "[s]ince on remand [the] BIA will exercise its discretion in whether to grant Petitioner's motion to reopen, we note that a blind acceptance of the IJ's adverse credibility findings . . . is unwarranted in light of the questionable quality of the interpreters"). And although the "substantial evidence" standard is a deferential one, a reviewing Court of Appeals should still give the administrative decision under review a "hard look." *N'Diom v. Gonzales*, 442 F.3d 494, 500 n.1 (6th Cir. 2006) ("Administrative review requires a hard look at all of the factors taken together . . . ."); *see also* Adam B. Cox, *Deference, Delegation, and Immigration Law*, 74 U. Chi. L. Rev. 1671, 1672 (2007) (arguing that Judge Richard Posner's "immigration opinions exhibit extremely searching review"); Veena Reddy, Note, *Judicial Review of Final Orders of Removal in the Wake of the Real ID Act*, 69 Ohio St. L.J. 557, 560 (2008) (noting that "[i]n one year alone, the Seventh Circuit remanded 40 percent of the 136 immigration cases it considered").

Legal questions, meanwhile, are reviewed de novo. *Alexandrov v. Gonzales*, 442 F.3d 395, 404 (6th Cir. 2006). And a discretionary denial of asylum to an otherwise-eligible applicant is reviewable, but is "conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(a)(2)(B)(ii), (b)(4)(D).

When the Board reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, this Court reviews the Board's decision as the final agency determination. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). But, to the extent the Board adopted the IJ's reasoning, this Court also reviews the IJ's reasoning. *Id*.

The Board issued a separate opinion in this case, relying on some of the alleged factual inconsistencies cited by the IJ: the discrepancy in the dates given for the alleged attack on Saed, the discrepancies in the proffered nature of Nancy's cousin's injury from the same attack, the apparent discrepancy in how many persons attacked Saed, and the letter from Saed's mother stating that his nose had been broken in "an accident." A.R. 3-4. As such, the Board held that it would "not disturb" the Judge's findings and adverse credibility determination. *Id*. Thus, the conclusions of the IJ that were adopted by the Board — those relating to the alleged attack on Saed and Nancy's cousin — are the proper foci of review.

## C. The Adverse Credibility Determination

The REAL ID Act of 2005 prescribes how a credibility determination should be made in an asylum case:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii).

Though this standard offers broad discretion to administrative fact finders, that discretion is not limitless. "It does not . . . permit a judge to 'cherry pick' facts or inconsistencies to support an adverse credibility finding that is unsupported by the record as a whole." *Ilunga v. Holder*, 777 F.3d 199, 207 (4th Cir. 2015) (citing *Ai Jun Zhi v. Holder*, 751 F.3d 1088, 1091 (9th

Cir. 2014)). "[A]t a minimum the [Immigration Judge] must consider the petitioner's explanation for any inconsistency to verify that an inconsistency actually exists, and then evaluate whether the discrepancy renders the entire testimony incredible in light of the record as a whole." *Ilunga*, 777 F.3d at 207 (citing *Shrestha v. Holder*, 590 F.3d 1034, 1040 (9th Cir. 2010)).

An alleged inconsistency in an applicant's application or testimony "provides inadequate justification [for an adverse credibility determination] when . . . there is a strong indication it results from translation errors or language-based misunderstanding, particularly when it is belied by an extensive record of otherwise consistent statements and corroborating evidence." *Id.* at 207-08 (citing *Shrestha*, 590 F.3d at 1040)).

The conclusions of the Board (and the underlying reasoning it adopted from the IJ) in support of the adverse credibility determination against the Maroufs were not supported by substantial evidence; they rested on speculation and conjecture, and showed no sensitivity to language barriers and the use of translators, as our precedents instruct they must. Moreover, the Maroufs' thorough and coherent account of their repeated persecution holds together and compels the conclusion that they testified credibly, despite the minor flaws that emerged in their long hours of testimony and large volume of evidence submitted.

### 1. The Alleged Beating — Number of Assailants

The four facts the Board referenced in affirming the IJ's adverse credibility determination all regard the attack on Saed by a mob of Muslim extremists. In reviewing the facts of this incident, the Board reasserted the erroneous finding of the IJ that Saed had been inconsistent regarding the number of assailants that had beaten him — apparently claiming 40 at one point in his testimony and 100 at another. A.R. 4. This finding was erroneous because Saed's testimony before the IJ reveals no such plain inconsistency.

Saed testified that, when he was attacked, he "noticed more than 100 people" in a mob outside his house. A.R. 272. Later, he testified to being attacked by "40 Muslim individuals." AR 289. The IJ made no effort to clarify if Saed had intended to communicate a difference in the number of persons merely present and those who actually attacked him (as Saed's words

appear to indicate), and made no inquiry as to whether the language barrier or use of translation could explain the potential discrepancy, as our precedents require. A.R. 82. The IJ simply concluded that Saed "cannot keep straight the number of people involved." *Id*. The Board contributed nothing further to the analysis, noting: "The Immigration Judge found that the respondents were inconsistent regarding the number of people involved . . . . We will not disturb the Immigration Judge's adverse credibility finding." A.R. 4.

Saed's testimony regarding the number of persons present at his beating and the number that actually participated does not reveal an obvious inconsistency, and does not amount to substantial evidence supporting an adverse credibility determination.

### 2. The Alleged Beating — The Cause of Saed's Injury

The Board's order also referred to a letter submitted in the Maroufs' application in which Saed's mother referred to his nose as having been broken "in an accident," as opposed to in a beating. A.R. 4. The IJ saw the letter, a translation of a note handwritten in Arabic, as a crucial inconsistency that "completely torpedoes everything" in the Maroufs' case. A.R. 82, 476-78. The IJ treated a single translated note as dispositive of the truth, despite the fact the Maroufs had consistently claimed through their application and testimony that Saed's nose had been broken in a beating by mob of Muslim extremists, holding: "to the extent that the respondent ever had any nose problem, we know from [Saed's mother's] letter it was not because of being beaten by Muslim extremists, it was because of some accident." A.R. 82. But the IJ failed to keep in mind the language barrier and use of translation; at no time during the Maroufs' lengthy testimony did the IJ make any effort to determine if the letter was mistranslated, or otherwise give the Maroufs an opportunity to explain it. Indeed, the IJ's first reference to it appears to have been in his order denying relief. *Id*.

Moreover, the mother's use of the word "accident," as translated from Arabic to English, is not necessarily inconsistent with a broken nose due to an attack or fight. Instead, it tends to corroborate that the nose was broken, as the Maroufs testified, but simply does not attempt to state precisely how or why. Thus, the Arabic letter is not necessarily inconsistent with how the broken nose occurred. "Accident" does not necessarily negate a blow to the nose by another person.

The IJ performed a catch-all inquiry with the Maroufs at the outset of their testimony to get them to certify that all the evidence they had submitted in their asylum application was accurately translated.  A.R. 59-60.  While this procedure was prudent, it was not sufficiently "sensitive to misunderstandings caused by language barriers [and] the use of translators", *Reyes-Cardona*, 565 F. App'x at 367, because it neither 1) gave the Maroufs a particular opportunity to address evidence that factored heavily in the IJ's ultimate adverse finding, nor 2) respected the fact that, since the Maroufs were not fluent English speakers, they would be unlikely to identify a mistranslation because the same error that was made in translating the note in the first place would likely have been repeated when the translated copy was translated back to them in Arabic.

Overall, the IJ failed to be sufficiently "sensitive to misunderstandings caused by language barriers, the use of translators, and cultural differences" and improperly relied on an alleged inconsistency despite a "strong indication it result[ed] from translation errors or language-based misunderstanding" because it was "belied by an extensive record of otherwise consistent statements and corroborating evidence." *Id.*; *Ilunga*, 777 F.3d at 207-08.  And the IJ improperly "cherry pick[ed]" an "inconsistenc[y] to support an adverse credibility finding that is unsupported by the record as a whole" without giving the petitioners a chance to explain that inconsistency in order "to verify that an inconsistency actually exist[ed]." *Ilunga*, 777 F.3d at 207.  In these circumstances, the translation of Saed's mother's letter does not rise to the level of substantial evidence that can support an adverse credibility determination.

### 3. The Alleged Beating — The Cousin's Injury

The Board's order also emphasized, as did the IJ, that the Maroufs' application and testimony variously referred to Nancy's cousin as having his hand, arm, or shoulder injured during the same incident when Saed was allegedly beaten.  A.R. 4, A.R. 82.  Paraphrasing the Maroufs' testimony and then offering his credibility conclusions, the IJ put it thusly:

> They beat me on the nose, they drug me outside, and they hurt Nancy's cousin. They broke his shoulder.  Of course, in her asylum application and in the statement attached to this respondent's withholding application, they claimed that the arm was broken, but in the prior testimony, the respondent's wife testified that they broke his hand.  So they cannot keep straight the number of people involved and what happened to the cousin.

*Id.* Once again, the IJ raised the alleged inconsistencies only in his order denying relief, A.R. 82, having afforded the Maroufs no opportunity during their testimony to address or explain them. There was only one reference to Nancy's cousin's injury in the Maroufs' asylum application, stating his arm was broken. A.R. 727. The subsequent allegedly inconsistent references to a hand or shoulder injury occurred during testimony, when a different translator (the court translator) was translating. A.R. 159, 395.

Importantly, all the references to Nancy's cousin's injury were made through translation, thus the IJ should have been "sensitive to misunderstandings caused by language barriers, the use of translators, and cultural differences." *Reyes-Cardona*, 565 F. App'x at 367. What may have seemed like a series of inconsistencies at the time could have been revealed through further inquiry to be the result of translational difficulties. Indeed, in colloquial Palestinian Arabic the same word can be used to mean both arm and hand. J. Elihay, *The Olive Tree: A Transliterated Dictionary of Conversational Eastern Arabic (Palestinian)* 213 (2004). It is also easy to imagine that an *upper*-arm injury could be referred to as either an injury of the shoulder *or* arm (which could then be translated as a hand injury). And lastly, the Maroufs never indicated that the cousin suffered only one injury; it is possible that any apparent inconsistencies merely reflected the fact that the cousin suffered multiple injuries.

As such, the alleged inconsistencies regarding Nancy's cousin's injury also "provide[] inadequate justification" for an adverse credibility determination because "there is a strong indication [they] result[ed] from translation errors or language-based misunderstanding . . . ." *Ilunga*, 777 F.3d at 207-08. The alleged inconsistencies concerning Nancy's cousin's injury do not rise to the level of substantial evidence that can support an adverse credibility determination.

### 4. The Alleged Beating — The Year it Occurred

The fourth and final fact specified by the Board's order was that Nancy Marouf had referred to Saed's beating as occurring in February 2007, while other references placed it in February 2006. A.R. 4. The IJ concluded on the basis of a statement submitted in Nancy's application referring to Saed's injury as having occurred in February 2007, that "a fraudulent document" had been submitted to the court. A.R. 285.

Saed attempted to explain the discrepancy as a possible misstatement or mistake in translation (the statement was made in Arabic and dictated to a translator), but the Immigration Judge concluded that Saed "was speaking out of both sides of his mouth within a matter of seconds about whose mistake the year was." A.R. 79, 282-90. In rejecting out of hand Saed's translation-based explanation because it was accompanied by an alternative explanation, the Immigration Judge made no effort to be "sensitive to misunderstandings caused by language barriers, the use of translators, and cultural differences." *Reyes-Cardona*, 565 F. App'x at 367. Despite Nancy's reference to Saed's injury and subsequent corrective surgery occurring in 2007, Saed Marouf was consistent in placing the injury in February 2006, and produced evidence of the corrective nose surgery he underwent in December 2006. A.R. 271, 273, 279, 281, 283, 288-90, 395, 400, 459-60, 502-06.

Even if the inconsistency was not the result of the language barrier, which it might well have been, and was actually stated, it still would not support an adverse credibility determination. In the context of a largely consistent account of persecution, reference to an incorrect date is not sufficient basis for discrediting an applicant's account. *See Ren v. Holder*, 648 F.3d 1079 (9th Cir. 2011) (finding that multiple date inconsistencies in an asylum applicant's otherwise consistent account were "manifestly trivial" and inadequate to sustain the Immigration Judge's adverse credibility determination). An inability to accurately recall the date when a traumatic event occurred is not particularly probative of a witness's credibility when alleging traumatic persecution, because such traumatic persecution itself may cause the witness difficulty in recalling details of the incident. *See id.* at 1085-86 ("We have previously recognized that victims of abuse 'often confuse the details of particular incidents, including the time or dates of particular assaults and which specific actions occurred on which specific occasion.'") (quoting *Singh v. Gonzales*, 403 F.3d 1081, 1091 (9th Cir. 2005) (citing Deborah Davis & William C. Follette, *Foibles of Witness Memory for Traumatic/High Profile Events*, 66 J. Air L. & Com. 1421, 1514–15 (2001))); *cf. Ilunga*, 777 F.3d at 212 (recognizing that bona fide victims of persecution may struggle to remain composed during testimony). It is worth emphasizing that Nancy consistently stated that Saed was beaten in February and operated on in December — testimony consistent with all other evidence. It makes intuitive sense that she would more readily be able to recall the months of the year in which these events happened,

because other contextual and seasonal factors (like weather, holidays, work schedules, and school schedules) allow one to more easily place an event within a certain time of year. In contrast, different years do not offer the same type of contextual information — for instance, one might easily recall that a certain event happened around Christmas, but struggle to remember if it was Christmas in 2006 or 2007.

In light of all these factors, Nancy's placement of Saed's beating and surgery in 2007 does not amount to substantial evidence supporting an adverse credibility determination. The IJ's conclusion that Nancy's application was fraudulent was "speculation and conjecture." *Al Ameri*, 361 F. App'x at 645.

## 5. A Reasonable Adjudicator Would Be Compelled to Reach a Contrary Conclusion

The four factual findings adopted by the Board in support of its adverse credibility determination do not constitute substantial evidence. *See supra* Parts II.C.1-4. Thus, the Board's "totality of the circumstances" adverse credibility determination, A.R. 3; 8 U.S.C. § 1158 (b)(1)(B)(iii), is necessarily not supported by substantial evidence.

Saed Marouf consistently testified that his nose was broken as a result of an attack by a mob of Muslims in February 2006, and that his nose was operated on in December 2006. A.R. 271, 273, 279, 281, 283, 288-90, 395, 400. Nancy also consistently testified that Saed's nose was broken by a Muslim mob in February and operated on in December (although she placed the incident in 2007, potentially as a result of a mistranslation or misremembering, *see supra* Part II.C.4). The Maroufs corroborated this account by producing medical records showing that Saed underwent a septoplasty at Augusta Victoria Hospital in Jerusalem in late December 2006. A.R. 502-04, 506. A septoplasty is a surgical procedure to correct a deviated septum — a disorder in which the septum that divides the left and right nostrils is displaced from the center of the nose. Mayo Clinic, Deviated septum: Treatments and drugs, http://www.mayoclinic.org/diseases-conditions/deviated-septum/basics/treatment/con-20031537. Trauma is one of the most common causes of a deviated septum. Mayo Clinic, Deviated septum: Causes, http://www.mayoclinic.org/diseases-conditions/deviated-septum/basics/causes/con-20031537. The Maroufs also submitted medical records from 2012 in which a Michigan doctor confirmed that the surgery had been performed, but diagnosed Saed as still suffering from a deviated

septum and nasal obstruction. A.R. 459-60 ("The examination confirms that the surgery was done[,] however there is still deflection off the anterior septum to the left . . . ." ).

The Maroufs offered ample evidence that the attack on Saed was premised on his being Christian in a predominantly Muslim society that persecuted Christians, and offered ample evidence of these premises. The priest in Taybeh issued a letter stating that the Maroufs were practicing Catholics and active in the Taybeh Catholic community, A.R. 500, and the family submitted Palestinian birth certificates listing all three as Christian, A.R. 519-20, 524. The Maroufs also submitted a document certifying Saed's baptism. A.R. 523. The Immigration Judge ultimately found that the Maroufs were "Catholic and Christian," A.R. 76, and the Board did not question that finding, A.R. 3-4.

The Maroufs also produced compelling evidence of general persecution of Christians by Muslims in the West Bank: multiple articles they submitted detail violence, sexual violence, harassment, and intimidation. A.R. 570-71, 576-77, 581-83. One article specifically chronicled Muslim persecution of Christians in Taybeh, recounting widespread violence and arson in 2005 that erupted after a Muslim woman became pregnant by a Christian man. A.R. 570.

Generally contemporaneous State Department reports support the picture of persecution these articles paint. In a 2010 report, the State Department wrote:

> "[Palestinian Authority] government policy contributed to the generally free practice of religion, although problems persisted throughout the reporting period. *The [Palestinian Authority] did not take sufficient action during the reporting period to investigate and bring to justice Persons who harassed, intimidated, and perpetrated attacks against some Christian residents of Bethlehem and Ramallah.*"

A.R. 669 (emphasis added). The Maroufs' hometown of Taybeh is a small village that is variously described as being part of or outside of Ramallah, and is addressed as "Taybeh Ramallah" in many formal contexts. *See* A.R. 493, 496, 500, 519-20, 524, 528-29, 536, 566, 570, 706, 712, 720, 755. The same 2010 State Department report noted that "[r]elations among other religious and ethnic groups, including Muslims and Christians . . . also continued to be strained," and that Palestinian Christian emigration from the West Bank accelerated after 2001, in part due to security concerns. A.R. 662-63, 667. Instead of relying on the many reports of

hostile relations between Muslims and Christians in the West Bank, in particular in the region where the Maroufs lived, the IJ relied on one statement in that same report that "Palestinian Christians and Muslims generally shared good relations" and concluded that the Maroufs' account was not "consistent with the country conditions," A.R. 98-100, 673. In so doing, he impermissibly "cherry-pick[ed]" a general statement that was belied by more specific and relevant evidence in the same report, *Ilunga*, 777 F.3d at 207,[2] and indicated a general state of mind hostile to the Maroufs.

The Maroufs' testimony about Saed's beating, the medical evidence of his injury and corrective surgery, the evidence of the Maroufs' Christian religion, and the extensive documentation of persecution of Palestinian Christians by neighboring Muslims strongly support that a Muslim mob did in fact descend on the Maroufs' home and violently attack Saed. The same evidence likewise refutes the IJ's unsupported conclusion that the Maroufs fabricated the incident. The Maroufs' evidence and testimony may not have been perfect, but perfection is not required and could not have been expected. The passage of time, the language barrier and use of translators, and the effects of stress on memory may all have produced deficiencies in the Maroufs' case. *See Reyes-Cardona*, 565 F. App'x at 367; *Ilunga*, 777 F.3d at 207-08; *Ren*, 648 F.3d at 1085-86. But notwithstanding any minor deficiencies, the Maroufs' evidence compels the conclusion that, at least as to Saed's beating at the hands of a Muslim mob, the Maroufs were credible. The IJ and Board were in error to hold otherwise. *See, e.g., Chen v. Gonzales*, 151 F. App'x 85 (2d Cir. 2005) (Substantial evidence did not support IJ's adverse credibility determination based on alien's lack of specificity and inconsistency of testimony with application where alien provided detailed testimony regarding her forced intrauterine device insertion, hiding from authorities, and telling cadres that she was too weak to be sterilized when they first wanted to take her for sterilization. Alien's failure to recall specific date of her sterilization, which revealed nothing about her fear for her safety, was a minor inconsistency.); *Chen v. Gonzales*, 173 F. App'x 32 (2d Cir. 2006) (Substantial evidence did not support IJ's

---

[2]The IJ also cited *Al Yatim v. Mukasey*, 531 F.3d 584 (8th Cir. 2008) in support of this conclusion. A.R. 99. That case does not support the conclusion that Palestinian Christians are not generally subject to persecution from Muslims in the West Bank, as the Eighth Circuit held only that the petitioner before it had not proven that *he* was or would be subject to persecution in the West Bank, and that he had not shown sufficiently changed country conditions since the time of filing his application to support his motion to reopen in the Board of Immigration Appeals. *See Al Yatim*, 531 F.3d at 586-91.

adverse credibility determination where alien testified in support of asylum application that he was persecuted for practicing Falun Gong before China banned Falun Gong, where the IJ ignored portions of State Department report that corroborated alien's claim that Falun Gong practitioners were persecuted before institution of ban.). Thus, we must vacate the denials of asylum and withholding of removal under the I.N.A. based on lack of credibility.

**D. Eligibility for Asylum and Withholding of Removal under the I.N.A.**

In order to establish asylum eligibility, an asylum applicant must show that he or she meets the definition of "refugee" under 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. 1158(b)(1)(A); *Kaba v. Mukasey*, 546 F.3d 741, 747 (6th Cir. 2008). That definition provides:

> The term "refugee" means . . . any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A). "Even though applicable statutes do not define the term persecution, we have determined that persecution within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Kaba*, 546 F.3d at 748 (citation and internal quotation marks omitted). "An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 208.13(b)(1); *Kaba*, 546 F.3d at 748. However:

> That presumption may be rebutted if an asylum officer or immigration judge . . . [finds that:] There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; or [that] . . . The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under all the circumstances, it would be reasonable to expect the applicant to do so.

8 C.F.R. § 208.13(b)(1), (b)(1)(i)(A)-(B); *Kaba*, 546 F.3d at 748.

As to withholding of removal under § 241(b)(3) of the I.N.A.,

[t]he burden of proof is on the applicant . . . to establish that his or her life or freedom would be threatened in the proposed country of removal on account of . . . religion . . . The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) Past threat to life or freedom.

(i)     If the applicant is determined to have suffered past persecution in the proposed country of removal on account of . . . religion . . . it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. This presumption may be rebutted if an . . . immigration judge finds by a preponderance of the evidence.

(A)     There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B)     The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii)     In cases in which the applicant has established past persecution, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of (b)(1)(i)(A) or (b)(1)(i)(B) of this section.

8 C.F.R. § 208.16(b)(1)(i)-(ii).

The IJ and Board, having determined that Saed and Nancy Marouf were not credible, concluded that the adverse credibility determination was fatal to their claims to asylum and withholding of removal. A.R. 4, 75. However, those determinations were in error, *supra* Part II.C., and we now consider whether they are eligible for asylum.

On the face of the record, the Maroufs have established eligibility for asylum and withholding under the I.N.A. Specifically, the Maroufs offered credible testimony of past

persecution: A Muslim mob descended upon their home and committed religiously-motivated violence against Saed. A violent attack on the basis of religion amounts to past persecution, even if perpetrated by civilians. *See Singh v. I.N.S.*, 94 F.3d 1353, 1359 (9th Cir. 1996) ("Discrimination, harassment, and violence by groups that the government is unwilling or unable to control can also constitute persecution."). This past persecution creates a presumption that the Maroufs have a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). But the Maroufs have established more than a mere *presumption* of a well-founded fear; that presumption is supported by the State Department report indicating the existence of Muslim-on-Christian violence in the area the Maroufs lived that the Palestinian Authority is unable or unwilling to control, A.R. 662-63, 667, 669. The Maroufs evidence therefore compels the conclusion that they have a sincere, well-founded fear of persecution in the West Bank.

## E. Discretionary Asylum

Asylum is a discretionary remedy vested in the Attorney General and delegated to Immigration Judges and the Board of Immigration Appeals. 8 U.S.C. § 1158(b)(1)(A); *Ljuljdjurovic v. Gonzales*, 132 F. App'x 607, 610 (6th Cir. 2005) ("Asylum can be granted by the Attorney General and, by delegated authority, the [Board of Immigration Appeals] and any [Immigration Judge]."). However, that discretion is subject to our review. 8 U.S.C. § 1252(a)(2)(B)(ii), (b)(4)(D). Because the IJ and Board erroneously found that the Maroufs were not credible, neither considered whether the Maroufs were eligible for asylum, *supra* Part II.D, and deserving of discretionary asylum.

Having held that the Maroufs are eligible for asylum, *supra* Part II.D, we also hold that, on the face of the record, the Maroufs are deserving of a discretionary grant of asylum.

Discretionary denials of asylum to otherwise-eligible applicants are rare and appropriate only in narrow circumstances. *See supra* Part II.A (noting that discretionary denials are rare and unusual, and appropriate only for "egregious conduct" such as crime and visa fraud). None of those circumstances appear to be present in the Maroufs' case, and unless such circumstances are adequately proven on remand, denial of asylum to the Maroufs will amount to an abuse of discretion. In the absence of evidence demonstrating such circumstances, the Maroufs shall be granted asylum.

We note that an Immigration Judge's determination that an applicant's testimony lacks credibility cannot form the basis of a discretionary denial of asylum if that testimony has been credited, as it has been here, for the purposes of determining asylum eligibility. *Kalubi v. Ashcroft*, 364 F.3d 1134, 1142 (9th Cir. 2004) ("We now make it clear that if an applicant's testimony on an issue is accepted for purposes of determining whether he is statutorily eligible for asylum, the same testimony must also be accepted for purposes of determining whether he is entitled to asylum as a discretionary matter.").

**F.**

It also bears emphasizing that the current Presidential Administration has a policy of sparing noncitizens from deportation if they have children born here who are therefore citizens of the United States. *See, e.g.*, Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, Policy No. 10075.1, Exercising Prosecutorial Discretion Consistent With the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens 4 (June 17, 2011) (promoting prosecutorial discretion in removal decisions based on "whether the person has a U.S. citizen or permanent resident . . . child"); U.S. Immigration and Customs Enforcement Directive 11064.1, Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities 3 (Aug. 23, 2013) ("[Homeland Security Field Office Directors] shall continue to weigh whether an exercise of prosecutorial discretion may be warranted for a given alien and shall consider all relevant factors in this determination, including whether the alien is a parent or legal guardian of a [citizen] or [legal permanent resident] minor . . . ."); *see also* Memorandum from Jeh Johnson, Secretary of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (creating a "deferred action" program for parents of United States citizens, commonly known as "DAPA"). *But see Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Texas 2015) (granting 26 states or their representatives preliminary injunction to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful

permanent residents, and to prevent expansion of Deferred Action for Childhood Arrivals (DACA program); 787 F.3d 733 (5th Cir. 2015) (denying motion to stay preliminary injunction or narrow its scope pending appeal); petition for cert. filed, (U.S. Nov. 20, 2015) (No. 15-674).

The Maroufs have two young American-citizen children born in the United States. If the Maroufs are deported, those children would be forced either to relocate with their parents to a violent country they have never been to, or remain in the United States as orphans. It is unclear why the Maroufs have been singled out for removal in light of the administration's policies. There are questions about whether these policies are being consistently followed at the prosecutorial level, *see, e.g.*, Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law Redux*, 125 Yale L.J. 104, 185-90 (2015) (concluding that the 2011 "Morton Memo" has been ineffective in influencing the exercise of prosecutorial discretion), along with ongoing concern from judges, scholars, and other observers that adjudication by Immigration Judges and the Board of Immigration Appeals is alarmingly inconsistent, *see, e.g.*, Adam B. Cox, *Deference, Delegation, and Immigration Law*, 74 U. Chi. L. Rev. 1671 (2007); Jaya Ramji-Nogales, Andrew I. Schoenholtz & Philip G. Schrag, *Refugee Roulette: Disparities in Asylum Adjudication*, 60 Stan. L. Rev. 295 (2007).

### III.  Conclusion

Although my colleagues concur separately, we all agree that the Board of Immigration Appeals' adverse credibility determination was not supported by substantial evidence, and that the record compels a contrary conclusion:  that the Maroufs credibly testified to being attacked and persecuted by Muslims on the basis of their Christian religion. In addition, the Maroufs' testimony is in keeping with evidence they presented of general persecution of Christians by Muslims in the West Bank:  the State Department reports, and multiple articles detailing violence, sexual violence, harassment and intimidation.

The petition for review is, therefore, granted; and we remand the case to the Board of Immigration Appeals so that it can reconsider its final order, in light of our joint view that that order is not supported by substantial evidence.

---

**CONCURRING IN THE JUDGMENT**

---

DAVID W. McKEAGUE, Circuit Judge, concurring in the judgment. I, too, agree that the IJ's and Board's adverse credibility determination is not supported by substantial evidence and that the Maroufs' petition for review be granted. However, to respect the congressionally-mandated deference to the agency, I express no opinion as to whether the petitioners are eligible for or facially deserving of asylum. The Supreme Court has made clear that, in determining asylum eligibility, the Courts of Appeal are "not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (discussing the appropriateness of appellate determinations of asylum eligibility and noting that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotation marks omitted); *see also Ward v. Holder*, 733 F.3d 601, 609 (6th Cir. 2013) (affirming the same). Accordingly, I decline to join sections II.E and II.F of this opinion, as well as any reference, either express of implied, that may be construed as mandating a grant of asylum for the petitioners.

---

**CONCURRING IN THE JUDGMENT**

---

HELENE N. WHITE, Circuit Judge, concurring in the judgment. I agree that the IJ's and BIA's adverse credibility determinations are not supported by substantial evidence and that the petition should be granted and the case remanded. To the extent the opinion can be understood to mandate the grant of relief on remand, I do not agree and would require only that the proceedings on remand be consistent with the remainder of the majority opinion. Further, I would not address the matters discussed in section II.F.