RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HUSSAM F.,

*Petitioner*,

*v.*

No. 17-3641

JEFFERSON B. SESSIONS, III, Attorney General,

*Respondent*.

On Petition for Review from the Board of Immigration Appeals;
No. A 205 191 758.

Argued:  March 8, 2018

Decided and Filed:  July 27, 2018

Before:  GILMAN, ROGERS, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Sehla Ashai, CONSTITUTIONAL LAW CENTER FOR MUSLIMS IN AMERICA, Richardson, Texas, for Petitioner.  Jessica D. Strokus, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Sehla Ashai, Kristine Cruz, Pei Yu, CONSTITUTIONAL LAW CENTER FOR MUSLIMS IN AMERICA, Richardson, Texas, for Petitioner.  Jessica D. Strokus, Anthony C. Payne, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

The court delivered a PER CURIAM opinion in which ROGERS, J., joined in Parts I, II.A, and II.B.  ROGERS, J. (pp. 25–28), delivered a separate opinion dissenting from Parts II.C and II.D. of the majority opinion.

—————————————

**OPINION**

—————————————

PER CURIAM.  Four years ago, Petitioner came to the United States on a K-1 fiancé visa, using a Syrian passport.  Although he was a Syrian citizen, his family had fled Syria decades ago to escape persecution.  Petitioner therefore had difficulty obtaining a passport from a Syrian consulate in the usual manner, and he instead relied on his father to get a passport for him through unknown contacts in Syria.  As it would turn out, however, this was a mistake.  The passport was not legitimate; it had been stolen from the Syrian government while blank, and Petitioner's biographical information was later inscribed without official approval.

When U.S. immigration officials learned of this, they initiated removal proceedings.  An immigration judge ("IJ") concluded that Petitioner was removable, but granted withholding of removal and asylum based on the risk of religious persecution that Petitioner would face if removed to Syria.  The IJ also granted him a waiver of removal under 8 U.S.C. § 1227(a)(1)(H), a statute that, if certain eligibility requirements are met, permits waiver of an alien's inadmissibility due to fraud or misrepresentation.  The Government appealed, however, and the Board of Immigration Appeals ("BIA" or "Board") reversed in part.  The Board affirmed the grant of withholding, but concluded that Petitioner was *not* entitled to asylum or to the § 1227(a)(1)(H) waiver.  The Board reasoned that he was statutorily ineligible for asylum, and that he did not deserve that form of relief as a matter of the Board's discretion because he intentionally failed to tell immigration officials about the non-traditional manner in which his passport had been obtained.  The Board also concluded that, with respect to the waiver, Petitioner neither met the statutory eligibility requirements nor merited the waiver as a matter of the Board's discretion.

Petitioner now seeks review of the BIA's decision.  As explained below, the Board's discretionary denial of asylum amounted to an abuse of discretion because the Board unreasonably applied its own binding precedent.  That precedent dictates that asylum may not be denied solely due to violations of proper immigration procedures, and also that the danger of persecution—which all agree exists in this case—should outweigh all but the most egregious

countervailing factors. As for the waiver, by statute courts are generally deprived of jurisdiction to review discretionary determinations such as the denial of a waiver under § 1227(a)(1)(H). This jurisdictional limitation does not apply here, however, because the BIA engaged in de novo review of the IJ's factual findings, in violation of its regulatory obligation to review those findings only for clear error.

## I.

Petitioner is a citizen of Syria, but he has never set foot in that country. His parents, Sunni Muslims, fled Syria before he was born to escape violence and persecution by the regime of Hafez al-Assad. Petitioner was born in Iraq, but grew up in Yemen, where the family had moved to avoid the First Iraq War. In Yemen, Petitioner's father found work as a doctor. The family was able to obtain temporary residency status, but this was derivative of the father's work residency and had to be renewed with increasing frequency. While living in Yemen, Petitioner obtained a bachelor's degree in computer engineering from a university in Sana'a. In 2011, however, the political situation in Yemen deteriorated. With the country headed toward revolution, Petitioner left for Turkey. He entered Turkey using a Syrian passport, obtained for him by his father, which was the predecessor of the passport at issue in this case. Petitioner testified that he had "no idea" where his father went to get this passport, but he believed it to be valid.

When Petitioner decided to pursue marriage, he sought his mother's advice on a suitable match. She suggested his cousin, Asma Alhaider, who is a United States citizen. Alhaider was born in the U.S. and has lived her whole life here; she graduated from an American university and works as an elementary school teacher in the Detroit area. Alhaider and Petitioner communicated electronically for about three years and then, in 2012, Alhaider traveled to Turkey to get to know Petitioner in person. They soon became formally engaged.

Alhaider and Petitioner then began the process of applying for a fiancé visa that would allow him to travel to the United States so they could be married.[1] *See* 8 U.S.C. § 1184(d).

---

[1]A fiancé visa, also known as a K-1 visa, is a nonimmigrant visa "granted to an alien solely 'to conclude a valid marriage with [the alien's U.S. citizen fiancé(e)] within ninety days after admission.'" *Birdsong v. Holder*,

Because Petitioner's Syrian passport was due to expire soon, he set about acquiring a new one to ensure passage to the U.S. He obtained this second passport just as he had the first one: through his father. According to Petitioner, his father would not divulge how he obtained the passport, but instead told Petitioner only that it was common for Syrian expatriates to seek the help of family in Syria for such matters. Petitioner testified that, although he understood he could not get a passport from the Syrian consulate because he had not completed his mandatory military service, he believed that his father could still get him a valid passport through his father's connections in Syria. Unfortunately, as it would turn out, this passport was a "stolen blank"— that is, a legitimate Syrian passport that had been stolen from the Syrian government and to which Petitioner's biographical information was later added without official approval. Evidence would later suggest that the passport might have been stolen by the terrorist organization known as the Islamic State of Iraq and the Levant ("ISIL"), although there is no indication that Petitioner himself has ever had anything to do with that group.

Using his new Syrian passport, Petitioner obtained a fiancé visa from the U.S. consulate in Ankara, Turkey. He then traveled to the United States, arriving on January 26, 2014. Upon arrival, he presented his new Syrian passport to immigration officials and was allowed to enter the country. Thereafter, he and Alhaider were married. In July of that year, Petitioner applied for and received an adjustment of status to that of a conditional permanent resident. *See* 8 U.S.C. § 1255(a), (d); *id.* § 1186a. In connection with the adjustment of status, he affirmed under oath that he had not obtained his visa by fraud or misrepresentation.

On December 12, 2015, the Department of Homeland Security ("DHS") learned that Petitioner might have entered the U.S. using a stolen blank passport. Petitioner was interviewed by federal agents twice at his home in January 2016, and he voluntarily turned over the passport for examination. Petitioner then left the U.S. on a planned trip to see family in Turkey, returning several weeks later on February 6, 2016. During this trip, he asked his father (now living in Turkey) about the passport, but his father refused to reveal from whom he had obtained it for fear of endangering that person. When Petitioner arrived back in the U.S., he was interviewed about

---

641 F.3d 957, 957 (8th Cir. 2011) (alteration in original) (quoting 8 U.S.C. § 1101(a)(15)(K)(i)). An alien admitted on a fiancé visa must marry his U.S. citizen fiancée within 90 days or else be subject to removal. 8 U.S.C. § 1184(d)(1).

the passport again. He explained that he had not completed his mandatory military service in Syria, and so he knew that the Syrian consulate would not issue him a passport. With the benefit of the information recently obtained from his father, he told agents that his father had gotten the passport from an unknown, well-connected person in Syria who could bypass official channels.

The Government initiated removal proceedings on February 24, 2016, filing a Notice to Appear that contained three charges of removability under 8 U.S.C. § 1227(a)(1)(A). Under that provision, an alien is removable if he was inadmissible at the time of a prior entry or adjustment of status. The Government alleged that Petitioner was removable because, at the time of a prior entry or adjustment of status, he had been inadmissible: (1) as a nonimmigrant not in possession of a valid passport, *see* 8 U.S.C. § 1182(a)(7)(B)(i)(I); (2) as an immigrant not in possession of a valid passport, *see id.* § 1182(a)(7)(A)(i)(I); and (3) because he had obtained a visa and admission to the U.S. "by fraud or willfully misrepresenting a material fact," *see id.* § 1182(a)(6)(C)(i).[2]

At a hearing before the IJ on March 14, 2016, Petitioner denied the three charges of removability and designated Syria as the country of removal based on his Syrian citizenship. On April 12, 2016, Petitioner submitted applications for: (1) a waiver of inadmissibility under 8 U.S.C. § 1227(a)(1)(H); (2) asylum; (3) withholding of removal; and (4) protection under the U.N. Convention Against Torture ("CAT").

Petitioner appeared with counsel for three hearings in June and July of 2016. At these hearings, the IJ heard testimony from Petitioner, Alhaider, Petitioner's aunt (who is also Alhaider's mother and thus Petitioner's mother-in-law), a DHS forensic document examiner who had examined Petitioner's passport and determined it to be a stolen blank, and the U.S. Citizenship and Immigration Services officer who had processed Petitioner's application for adjustment of status. The relevant substance of this testimony has been related above. Additionally, Petitioner offered expert testimony from Professor Keith David Watenpaugh of the

---

[2]Although the Notice to Appear does not spell this out, presumably Petitioner was charged with being inadmissible as a nonimmigrant under § 1182(a)(7)(B) based on his initial entry into the United States (at which time he had only a fiancé visa, which is classified as a nonimmigrant visa), and he was charged with being inadmissible as an immigrant under § 1182(a)(7)(A) based on his later adjustment of status (at which time he became an immigrant).

University of California, Davis, who explained that Syrians living in exile often have difficulty getting passports, and that they might view Syrian consulates as "enemy territory" and therefore avoid consulates for fear of placing themselves and their families at risk. He further testified that the practice of purchasing forged passports or bribing government officials to obtain passports is widely accepted among Syrians living in exile.

The IJ issued his decision on September 12, 2016. The IJ sustained all three charges of removability and denied CAT protection. But he granted Petitioner a waiver of removal under 8 U.S.C. § 1227(a)(1)(H), asylum, and withholding of removal. The IJ first made a credibility determination, finding Petitioner's explanation regarding the passport to be credible insofar as he purported to have "blindly trusted his father to obtain his passport from Syria under a 'don't ask, don't tell' policy." However, despite Petitioner's "attempt to remain willfully blind to the passport application process," the IJ concluded that Petitioner "knew that the document was obtained in a non-traditional (if not improper) manner." "That knowledge was enough to put him on notice that the passport, purportedly issued by the Syrian government, might have been acquired improperly." Still, the IJ also found that Petitioner had "little if any reason . . . to suspect that [the passport] was a 'stolen blank' document," and that Petitioner believed the passport had been "acquired in the usual manner for a Syrian citizen opposed to the government and a member of a family living in exile."

The IJ granted Petitioner a waiver of removal under 8 U.S.C. § 1227(a)(1)(H). That provision gives the Attorney General discretion to waive an alien's removability on the grounds specified in 8 U.S.C. § 1182(a)(6)(C)(i), i.e., that the alien obtained admission by fraud or willful misrepresentation. However, the Attorney General may exercise this discretion only if certain requirements are met. First, the alien must be "the spouse, parent, son, or daughter of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence." *Id.* § 1227(a)(1)(H)(i)(I). Second, the alien must have been "in possession of an immigrant visa or equivalent document and [have been] otherwise admissible to the United States at the time of such admission except for those grounds of inadmissibility specified under paragraphs (5)(A) and (7)(A) of section 1182(a) of this title which were a direct result of that fraud or misrepresentation." *Id.* § 1227(a)(1)(H)(i)(II). If those requirements are met, the Attorney

General may exercise his discretion to grant the waiver, which the statute further explains "shall also operate to waive removal based on the grounds of inadmissibility directly resulting from such fraud or misrepresentation." *Id.* § 1227(a)(1)(H).

Application of the waiver is thus a two-step process. First, the alien must meet the above requirements simply to be eligible for the waiver. Second, the Attorney General must determine that, in his discretion, the waiver should be granted. *See Singh v. Gonzales*, 451 F.3d 400, 410–11 (6th Cir. 2006).

Here, the IJ concluded that, when Petitioner initially entered the U.S., he was not in possession of an immigrant visa as required by the waiver statute, because at that time he had only a *nonimmigrant* fiancé visa, which, the IJ determined, was not an "immigrant visa or equivalent document." However, the IJ held that Petitioner did qualify for the waiver at the time he adjusted his status (which counts as an "admission" for purposes of the statute). *See Matter of Agour*, 26 I. & N. Dec. 566, 570 (BIA 2015). The IJ then concluded that, under our decision in *Avila-Anguiano v. Holder*, 689 F.3d 566, 570 (6th Cir. 2012), even though Petitioner qualified for the waiver only with respect to his later adjustment of status and not his initial entry into the country, he could still use it to waive his earlier misrepresentation made when he first entered the U.S.

The IJ next held that Petitioner deserved the waiver as a matter of discretion. Petitioner's misrepresentation was "not . . . particularly egregious," because the passport appeared valid even to trained immigration officials, and Petitioner had no reason to suspect that it had been stolen from the Syrian government. There was "no other evidence that [Petitioner] is an individual of bad character," and the IJ found that any suggestion of a connection between Petitioner and ISIL was merely "unsubstantiated suspicion." Additionally, the IJ reasoned that Petitioner was deserving of the waiver because it would help him stay with Alhaider, who is a U.S. citizen, it would remove him from his former life of statelessness, and it would prevent Petitioner from being sent to a country he had never lived in that was enduring a violent civil war.

The IJ also granted Petitioner asylum. *See* 8 U.S.C. § 1158. To obtain asylum, Petitioner first had to show that he was a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A),

meaning that he was unable or unwilling to reside in Syria "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Second, he had to show that he merited a favorable exercise of discretion. *See id.* § 1158(b)(1)(A); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987). The IJ held that Petitioner demonstrated a well-founded fear of persecution in Syria based on his Sunni Muslim religion, and that he merited a favorable exercise of discretion for the same reasons he merited the § 1227(a)(1)(H) waiver.

Finally, the IJ granted withholding of removal because Petitioner had demonstrated a "clear probability" that he would face harm in Syria on account of his religion. *See INS v. Stevic*, 467 U.S. 407, 413 (1984); *see also* 8 U.S.C. § 1231(b)(3)(A). CAT protection, however, was denied.

The Government appealed, and the BIA affirmed the grant of withholding but reversed the IJ's grants of the § 1227(a)(1)(H) waiver and asylum.**[3]** The Board first denied the waiver, concluding that Petitioner was neither statutorily eligible nor merited a favorable exercise of discretion. Contrary to the IJ, the Board did not read our decision in *Avila-Anguiano* to permit Petitioner's eligibility for the waiver based on his adjustment of status to also waive his removability based on misrepresentations made at the time of his initial entry. The Board also held that one of Petitioner's grounds of inadmissibility—his entry as a nonimmigrant without a valid passport, *see* 8 U.S.C. § 1182(a)(7)(B)(i)(I)—cannot be waived by § 1227(a)(1)(H). The BIA further concluded that Petitioner did not merit the waiver as a matter of discretion. To reach this determination, the Board balanced "the evidence of [Petitioner's] undesirability as a permanent resident" against "the social and humane considerations present" to determine "whether a grant of relief is in the best interests of this country." *See Matter of Tijam*, 22 I. & N. Dec. 408, 412 (BIA 1998). The Board concluded that a waiver was not in the country's best interests because Petitioner "kn[e]w that [his passport] was obtained in a non-traditional manner, he remained willfully blind as to its origins, and he intentionally withheld that information in order to gain entry into the United States." The Board also emphasized as a negative factor that

---

**[3]**Board Member Michael J. Creppy dissented, but only as to the Board's conclusion that Petitioner was not statutorily eligible for the § 1227(a)(1)(H) waiver.

Petitioner failed to get clarification from his father about the passport's origins, even though there is evidence that it might have been stolen by a terrorist organization. In the Board's view, these negative factors outweighed the positive factors that Petitioner was married to a U.S. citizen, he enjoyed a close relationship with his U.S. citizen in-laws, he had no criminal history, he volunteered, was highly educated, and performed skilled labor in the technology field. The Board also reasoned that concerns about breaking up Petitioner's family unit were lessened because Alhaider testified that she would go with Petitioner if he were deported to Syria, and that the humanitarian concerns about sending Petitioner to live in Syria were lessened because the Board affirmed the IJ's grant of withholding, so Petitioner was not in imminent danger of removal to that country.

The BIA also denied asylum, first because Petitioner was not eligible for asylum due to his being "firmly resettled" in Yemen, *see* 8 U.S.C. § 1158(b)(2)(A)(vi); 8 C.F.R. § 1208.15, and second because, regardless of whether Petitioner was firmly resettled, the Board would deny asylum as a matter of its discretion for the same reasons that it denied the § 1227(a)(1)(H) waiver.

The BIA's decision was issued on May 17, 2017. The case was remanded to the IJ. On June 12, 2017, the IJ entered an order of removal, ordering Petitioner to be removed to Syria but also granting withholding of removal. On June 15, 2017, Petitioner petitioned this court to review the BIA's denials of his applications for the waiver and asylum.

## II.

### A.

As a preliminary matter, the Government contends that we lack jurisdiction over Petitioner's entire petition for review because he failed to attach a copy of the IJ's June 12, 2017, final order of removal to the petition. This argument has two components. First, the Government notes that we have jurisdiction to review only "a final order of removal." 8 U.S.C. § 1252(a)(1). According to the Government, the IJ's June 12 order of removal was the only "final order of removal" in this case, and therefore our jurisdiction is limited to a review of that order, and not the BIA's decision itself. Second, the Government contends that we lack

jurisdiction even to review the IJ's June 12 order because the immigration statute provides that a petition for review of an order of removal "shall attach a copy of such order," *id.* § 1252(c)(1), and, because Petitioner did not attach the IJ's June 12 order to his petition, he has "failed to petition for review of" that order.

We need not reach the Government's second argument—that we lack jurisdiction to review the IJ's June 12 order because it was not attached to the petition for review—because that was not the only final order of removal in this case. The immigration statute defines "order of deportation," which is interchangeable with "order of removal,"[4] as "the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, *concluding that the alien is deportable* or ordering deportation." 8 U.S.C. § 1101(a)(47)(A) (emphasis added). Thus, "the statutory requirement of an order of removal is satisfied when . . . the IJ *either* orders removal or concludes that an alien is removable." *Giraldo v. Holder*, 654 F.3d 609, 613 (6th Cir. 2011) (alterations in original) (quoting *Lazo v. Gonzales*, 462 F.3d 53, 54 (2d Cir. 2006) (per curiam)). "[I]f the IJ makes a finding of removability, that finding satisfies § 1101(a)(47)'s definition of an order of deportation." *Id.* (quoting *Sosa-Valenzuela v. Gonzales*, 483 F.3d 1140, 1146 (10th Cir. 2007)). Accordingly, when the IJ in this case concluded in his original decision that Petitioner was removable, that qualified as an order of removal, even though the IJ also granted asylum and a waiver. Moreover, an order of removal "becomes 'final' upon 'a determination by the Board of Immigration Appeals affirming such order,' or upon 'the expiration of the period in which the alien is permitted to seek review of such order' by the BIA." *Id.* (quoting 8 U.S.C. § 1101(a)(47)(B)(i) & (ii)). Therefore, when the BIA affirmed the IJ's finding of removability and reversed the IJ's grants of asylum and the waiver, that amounted to a final order of removal because it "left in place" the IJ's order that Petitioner was removable, and Petitioner's opportunity to seek review of that order had passed. *See id.* at 614; *see also Perkovic v. INS*, 33 F.3d 615, 619 (6th Cir. 1994) ("We are aware of no authority for the proposition that a Board

---

[4]The term "order of removal" is an updated version of the older term "order of deportation." *See Calcano-Martinez v. INS*, 533 U.S. 348, 350 n.1 (2001); *Warner v. Ashcroft*, 381 F.3d 534, 537 (6th Cir. 2004) (per curiam) (noting that, under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, "an order of removal includes 'an order of exclusion and deportation or an order of deportation'" (quoting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 309(d)(2), 110 Stat. 3009–627)).

order rejecting an asylum application is not a final order unless a formal order of deportation has already been issued."). Because Petitioner has clearly petitioned for review of that final order of removal, our jurisdiction is not affected by Petitioner's failure to attach the IJ's June 12 order to his petition.

**B.**

Petitioner challenges the BIA's denial of his claim for asylum. Asylum is a discretionary form of relief: the asylum statute provides that "the Attorney General *may* grant asylum to an alien" who meets certain eligibility requirements. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). Thus, even if an alien is otherwise eligible, the Attorney General still has discretion to grant or deny asylum. *See Cardoza-Fonseca*, 480 U.S. at 428 n.5. When the BIA has exercised this discretion to deny asylum, our review is statutorily circumscribed: we may reverse only if the denial was "manifestly contrary to the law and an abuse of discretion."[5] *See* 8 U.S.C. § 1252(b)(4)(D); *see also id.* § 1252(a)(2)(B)(ii); *Marouf v. Lynch*, 811 F.3d 174, 181 (6th Cir. 2016).

Here, the BIA abused its discretion because it unreasonably applied its own precedential legal decisions that govern how the Board may exercise that discretion. The Board's analysis identified only one factor counting against Petitioner: his intentional failure to disclose that his passport was obtained in a non-traditional manner. On the opposite side of the balance, the Board identified several positive factors: Petitioner's wife is a U.S. citizen and he has a close relationship with his in-laws, also U.S. citizens; he has no criminal history; he volunteers; he is highly educated; and he performs skilled labor in the technology field. The Board's analysis thus boils down to the conclusion that Petitioner's failure to disclose the uncertain origins of his passport on its own outweighed the litany of factors cutting in his favor.

This runs afoul of the BIA's precedential decision in *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987). There, the BIA concluded that "the totality of the circumstances . . . should be examined in determining whether a favorable exercise of discretion is warranted," and in

---

[5]This is an explicit exception to the general rule that matters within the Attorney General's discretion are unreviewable. *See* 8 U.S.C. § 1252(a)(2)(B)(ii).

particular that an alien's circumvention of proper immigration procedures could not be a sole dispositive factor against the alien's claim, and "should not be considered in such a way that the practical effect is to deny relief in virtually all cases." *Id.* at 473; *see also Kouljinski v. Keisler*, 505 F.3d 534, 542 (6th Cir. 2007). Although such circumvention may be taken into account as a "serious adverse factor," it must be considered as just one factor in the "totality of the circumstances." *Pula*, 19 I. & N. Dec. at 473. In other words, although the BIA may consider an alien's failure to comply with established immigration procedures, it may not do so to the practical exclusion of all other factors. Here, Petitioner certainly should have been more forthcoming with immigration officials. But under *Pula*, the Board's analysis may not begin and end with his failure to follow proper immigration procedures. *See Zuh v. Mukasey*, 547 F.3d 504, 511 n.4 (4th Cir. 2008) (citing *Pula* and noting that "the presence of immigration law violations" is a relevant factor, but "the BIA has cautioned against affording it too much weight").[6]

BIA precedent also holds that "[t]he danger of persecution will outweigh all but the most egregious adverse factors." *Matter of Kasinga*, 21 I. & N. Dec. 357, 367 (BIA 1996); *see also Kouljinski*, 505 F.3d at 542. In affirming the IJ's grant of withholding in this case, the BIA upheld the IJ's conclusion that Petitioner had shown "a clear probability that his life or freedom will be threatened on account of his Sunni religion if returned to Syria." Because the "clear probability" standard requires a showing that harm is "more likely than not" to result from removal, *Kamar v. Sessions*, 875 F.3d 811, 817 (6th Cir. 2017) (quoting *Stevic*, 467 U.S. at 429–30), the BIA acknowledged that it is more likely than not that Petitioner would face harm due to his religion if returned to Syria. According to its own precedent, this should "outweigh all but the most egregious adverse factors." *See Kasinga*, 21 I. & N. Dec. at 367. To the contrary, however, the Board determined that the "clear probability" that Petitioner would suffer persecution was outweighed simply by his failure to disclose that his passport was not obtained

---

[6]It is true that the Board also noted that "there is evidence in the record indicating that the respondent's passport may have been trafficked by terrorists," and that, in light of this possibility, it was "significant" that "the respondent and his father never explained how the passport was actually obtained." But the Board did not explain how this is significant. The sins of the father are not normally attributed to the son.

in the usual manner. This cannot be reasonably termed the "most egregious" of adverse factors. In this respect, too, the BIA unreasonably applied its own binding precedent.

In a similar vein, BIA precedent dictates that, because Petitioner made misrepresentations to circumvent orderly refugee procedures, "the seriousness of the [misrepresentations] should be considered." *Pula*, 19 I. & N. Dec. at 474. The BIA's opinion does not show that it evaluated Petitioner's misrepresentations on a sliding scale of seriousness. The Board noted only that Petitioner remained "willfully blind" to the passport's origins and that he intentionally failed to disclose this fact to immigration officials. This does not appear to be an overly serious misrepresentation. Indeed, the IJ found that Petitioner's misrepresentations were not "particularly egregious," given that the passport appeared valid and there was "little if any" reason for him to believe it was stolen. If the BIA disagreed and believed this was in fact a serious kind of fraud, it should have said so and explained why. The BIA's apparent failure to consider the relative seriousness of Petitioner's fraud is another way in which the Board unreasonably applied its precedent to this case.

The BIA's unreasonable application of these precedential legal decisions was an abuse of discretion. By regulation, the BIA must follow its own precedents unless they are modified or overruled. 8 C.F.R. § 1003.1(g). Although the BIA is entitled to some leeway in interpreting the meaning of its own precedents, the BIA here did not reasonably apply its precedents in considering whether to grant or deny asylum.

Moreover, this is not the type of case where asylum is typically denied. Although not a hard-and-fast rule, we have previously observed that "[t]he grounds upon which asylum can be discretionarily denied to an otherwise-eligible applicant appear in practice to be limited to cases of 'egregious conduct by the applicant,' such as criminal convictions or fraud." *Marouf*, 811 F.3d at 180 (quoting *Zuh*, 547 F.3d at 507). For instance, in *Kouljinski*, we held that the IJ "did not abuse his discretion . . . by basing his discretionary denial of asylum on Kouljinski's three drunk-driving convictions." 505 F.3d at 543. But here, Petitioner has no criminal convictions, and although he certainly made misrepresentations by failing to disclose his passport's murky origins, the IJ did not find that these misrepresentations amounted to fraud. Furthermore, as the Fourth Circuit has noted in a similar case, it is quite uncommon to deny

asylum as a matter of discretion when withholding of removal has been granted. *Zuh*, 547 F.3d at 507–08.

**C.**

Apart from the BIA's discretionary denial, the BIA determined that Petitioner was not eligible for asylum because he was firmly resettled in Yemen. *See* 8 U.S.C. § 1158(b)(2)(A)(vi); 8 C.F.R. § 1208.15. "A finding of 'firm resettlement' is a factual determination that we review under the deferential substantial evidence standard." *Hanna v. Holder*, 740 F.3d 379, 386 (6th Cir. 2014) (quoting *Maharaj v. Gonzales*, 450 F.3d 962, 967 (9th Cir. 2006) (en banc)). On appeal, the Government does not defend the Board's conclusion. Rather, in the event that we find that the Board abused its discretion in discretionarily denying Petitioner asylum, the Government urges us to remand the case to allow the Board to "clarify the standard it used in making its firm resettlement determination."

The Board appears to have applied the proper framework for evaluating the firm-resettlement question, and the Government does not explain how the Board's statement of the governing law was improper or "unclear." We deem the Government's failure to respond to Petitioner's argument that the Board erred in finding him firmly resettled in Yemen to be a concession that the Board's decision was not supported by "substantial evidence." *See id.*; *Puckett v. Lexington-Fayette Urban County Gov't*, 833 F.3d 590, 611 (6th Cir. 2016) ("The failure to present an argument in an appellate brief waives appellate review." (quoting *Middlebrook v. City of Bartlett*, 103 F. App'x 560, 562 (6th Cir. 2004))). Accordingly, with respect to Petitioner's asylum claim, the BIA's sole task on remand is to exercise its discretion in accordance with its governing precedent.

**D.**

Petitioner also challenges the BIA's denial of a waiver under 8 U.S.C. § 1227(a)(1)(H). The BIA denied him a waiver for two independent reasons. First, the Board concluded that he did not meet the statutory eligibility requirements. Second, the Board determined that Petitioner did not merit a favorable exercise of discretion. In order to prevail, Petitioner must show that both of these conclusions were incorrect. We will address both issues in turn.

**1.**

We will initially consider whether there is a basis for the BIA to revisit its discretionary denial of a § 1227(a)(1)(H) waiver. That analysis requires us to determine first whether we have jurisdiction to review the Board's decision. Congress has stripped our jurisdiction to review the Attorney General's decision to deny a waiver under § 1227(a)(1)(H) in a statutory provision that precludes judicial review of decisions explicitly within the Attorney General's discretion. This provision states that "no court shall have jurisdiction to review any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General." 8 U.S.C. § 1252(a)(2)(B)(ii). Petitioner does not argue that § 1227(a)(1)(H) is a form of nondiscretionary relief, nor could he: § 1227(a)(1)(H) says that, if various eligibility conditions are met, an alien's inadmissibility "may, in the discretion of the Attorney General be waived." Therefore, as a general rule, we lack jurisdiction to review the discretionary component of the BIA's denial of a § 1227(a)(1)(H) waiver. *Singh*, 451 F.3d at 410–11.

But Petitioner argues that an exception applies in this case that provides jurisdiction. He bases his argument on 8 U.S.C. § 1252(a)(2)(D), which preserves review for "constitutional claims and questions of law" that arise during the BIA's exercise of its discretionary authority. *See Ghazali v. Holder*, 585 F.3d 289, 291 (6th Cir. 2009) (holding that a petition that raised a question of law came within § 1252(a)(2)(D), which this court characterized as "a statutory exception to the jurisdiction-stripping provision"). Petitioner casts his petition as presenting a question of law, noting that, by regulation, the BIA may not engage in de novo review of an IJ's findings of fact, but instead may set aside those findings only if clearly erroneous. 8 C.F.R. § 1003.1(d)(3)(i).

The BIA accurately stated in Petitioner's case that its review of the IJ's factual findings was governed by the clear-error standard. But Petitioner contends that the BIA actually based its decision on different facts than those found by the IJ without holding that any of the IJ's factual findings were clearly erroneous. He therefore argues that we have jurisdiction under § 1252(a)(2)(D) to review whether the Board violated 8 C.F.R. § 1003(d)(3)(i) by improperly engaging in de novo factfinding.

Although some circuits have interpreted § 1252(a)(2)(D) to allow for review of "mixed questions of fact and law," *see Ramadan v. Gonzales*, 479 F.3d 646, 648 (9th Cir. 2007) (per curiam); *see also Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 329–30 & n.7 (2d Cir. 2006), this court has rejected those broad interpretations of the provision, *Khozhaynova v. Holder*, 641 F.3d 187, 192 (6th Cir. 2011). This court has nevertheless found that § 1252(a)(2)(D) provides jurisdiction to review whether the BIA has complied with 8 C.F.R. § 1003.1(d)(3)(i). *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006).

Noting that "BIA review under an incorrect standard of review implicates [petitioners'] due process rights," this court held in *Tran* that it had jurisdiction under § 1252(a)(2)(D) to review whether the Board violated 8 C.F.R. § 1003.1(d)(3)(i) by applying the wrong standard of review in denying relief under the Convention Against Torture (CAT). *Id.* at 943–44. In that case, the Board never stated the standard of review that it was applying. *Id.* at 943. The court therefore examined the Board's presentation of the facts, but was also unable to ascertain the standard of review that the Board implicitly applied. *Id.* at 944. Accordingly, the court remanded the case to the Board for reconsideration of the CAT claim under the proper standard of review. *Id.*

*Tran* demonstrates that whether the BIA employed the correct standard of review is among the "constitutional claims and questions of law" that § 1252(a)(2)(D) excludes from the INA's jurisdiction-stripping provision. Although the Board here, unlike in *Tran*, stated the proper standard of review that it purportedly applied, that is a distinction without difference. The invocation of the correct standard of review does not diminish the due-process injury caused when the Board in fact applies an improper standard of review. *See id.* This court has thus cited *Tran* for the proposition that "[q]uestions of law include . . . whether the BIA employed the correct standard of review and burden of proof," without indicating that such review is limited to confirming that the Board stated the proper standard. *Mendoza-Rodriguez v. Holder*, 564 F. App'x 222, 224 (6th Cir. 2014). Accordingly, based on *Tran* and *Mendoza-Rodriguez*, we conclude that § 1252(a)(2)(D) provides jurisdiction for this court to confirm that the Board actually applied the standard of review that it announced in its decision.

This holding is in accord with comparable decisions from our sister courts. *See, e.g.*, *Kaplun v. Att'y Gen. of U.S.*, 602 F.3d 260, 272–73 (3d Cir. 2010) (remanding a BIA decision denying CAT relief because, "even though the BIA purported 'not [to] find facts [itself,]' . . . it appears that the BIA reexamined the record and conducted *de novo* fact-finding" (alterations in original) (quoting *Matter of V-K-*, 24 I. & N. Dec. 500, 502 (BIA 2008))); *Kabba v. Mukasey*, 530 F.3d 1239, 1246, 1249 (10th Cir. 2008) (remanding a BIA decision denying withholding of removal and other relief because, "[a]lthough the BIA's opinion set forth the correct standard of review . . . , it instead engaged in its own fact finding in violation of § 1003.1(d)(3)(i)").

Having concluded that we possess jurisdiction to determine whether the BIA applied the proper standard of review, we will next examine whether the Board in fact applied the clear-error standard to the IJ's factfinding in Petitioner's case. Petitioner identifies four categories of facts in the BIA's decision that he contends contradict the IJ's factfinding despite no clear-error analysis. We will consider each in turn.

First, Petitioner argues that the BIA engaged in de novo factfinding by stating that Petitioner "intentionally withheld" from authorities that he had "obtained [his passport] in a non-traditional manner" and "remained willfully blind as to its origins." The IJ did find that Petitioner "attempt[ed] to remain willfully blind to the passport application process" and "knew that the document was obtained in a non-traditional (if not improper) manner." But the IJ also found that Petitioner "believed [that the passport] was being acquired in the usual manner for a Syrian citizen opposed to the government and a member of a family living in exile," and that he had "little if any reason . . . to suspect that [the passport] was a 'stolen blank' document." Without engaging in clear-error analysis, the Board failed to mention these critical facts that greatly temper the IJ's findings about Petitioner's willful blindness to the passport's origins.

Moreover, the IJ never found that Petitioner had "intentionally withheld" his knowledge of the non-traditional manner in which his passport was acquired. Aliens are removable under 8 U.S.C. § 1182(a)(6)(C)(i) for either (1) fraud, or (2) a willful misrepresentation of a material fact committed during admission into the United States. Fraud requires proof of an intent to deceive. *Parlak v. Holder*, 578 F.3d 457, 463 (6th Cir. 2009). But a willful misrepresentation of a material fact requires proof only that (1) the alien had "'knowledge of the falsity' of facts

presented to an immigration officer," and (2) the "fact was material." *Bazzi v. Holder*, 746 F.3d 640, 645 (6th Cir. 2013) (quoting *Parlak*, 578 F.3d at 463–64). The IJ held that Petitioner committed a willful misrepresentation of a material fact because he knew and failed to disclose that his passport had been acquired by non-traditional means, which was a material omission because its disclosure would have prompted more careful scrutiny of his passport. But because Petitioner had "little if any reason . . . to suspect that [the passport] was a 'stolen blank' document" and believed that it had been "acquired in the usual manner for a Syrian citizen opposed to the government and a member of a family living in exile," the IJ did not find that Petitioner's actions constituted fraud.

Second, Petitioner contends that the BIA conducted its own factfinding by faulting Petitioner for failing, along with his father, to "explain[] how the passport was actually obtained," despite the supposed possibility that the "passport may have been trafficked by terrorists." The IJ was highly critical of the Government's invocation of ISIL during the proceedings before him. Although Petitioner's passport contained a serial number that falls within a range of passports that the International Police Organization (INTERPOL) reports were stolen by ISIL and another terrorist organization, the IJ dismissed "the Government's allusions that [Petitioner] may have some connection to [ISIL]" as an "unsubstantiated suspicion of national security implications."

The BIA's resuscitation of fears concerning Petitioner's connections to ISIL runs contrary to the IJ's findings. Although the Board cabined its discussion of ISIL to a suggestion of a nexus between the passport and the terrorist organization (rather than Petitioner himself and ISIL), it held this fact against Petitioner when exercising its discretion to deny him a § 1227(a)(1)(H) waiver. There was no reason for the Board to hold the passport's potential connection to terrorist activity against Petitioner if it was not also implying that Petitioner himself posed a national-security risk to the United States, a conclusion that the IJ pointedly rejected.

Third, Petitioner faults the BIA for finding that he "does not know whether his father obtained the passport through bribery or other improper means" and that he never "got clarification from his father[,] . . . remain[ing] willfully blind in this regard." To the contrary,

the IJ did not find that Petitioner remained willfully blind to the passport's origins after he became aware that he possessed a fraudulent passport. Petitioner indeed confronted his father about the passport during a return trip to Turkey after his second interview with immigration authorities. The IJ found, however, that Petitioner's father "did not and would not reveal . . . how the passport had actually been obtained" for fear that "doing so would endanger the individual in Syria who helped him obtain" the document. Based on the IJ's findings, Petitioner cannot be said to have remained willfully blind to the passport's origins because he attempted to secure more information once immigration authorities determined that the passport was fraudulent.

Finally, Petitioner argues that the BIA, based on its own factfinding, discounted a critical factor that should have weighed in favor of granting him a § 1227(a)(1)(H) waiver—his wife's status as a U.S. citizen. Although an alien's "family ties in the United States" should weigh in favor of granting a waiver, *Tijam*, 22 I. &. N. Dec. at 412, the Board failed to credit Petitioner's marriage as a factor in his favor because Alhaider "indicated that she would accompany [Petitioner] if he were removed from the United States." This treatment of the issue omits key contextual details from the IJ's decision. The IJ emphasized that Alhaider, who he deemed credible, was willing to accompany Petitioner *despite* fearing "that she would also be targeted [in Syria] due to [her] shared family history [with Petitioner], her and her father's political activism, and her status as a United States citizen." Surely the United States does not demand that its citizens risk death in order to preserve the family unit. By neglecting to mention this important detail, the Board exercised its discretion based on a highly distorted recasting of the IJ's findings.

Judging from the multiple instances in which the BIA's decision finds facts contrary to the IJ, omits key facts that temper other findings, or discusses facts in a misleading light, the Board violated 8 C.F.R. § 1003.1(d)(3)(i) by engaging in de novo factfinding. We must therefore determine whether Petitioner is statutorily eligible for a § 1227(a)(1)(H) waiver. If he is, then we must remand the case to the BIA to exercise its discretion once again, but based on all of the facts as found by the IJ, unless those facts are found by the BIA to be clearly erroneous.

**2.**

Having concluded that the BIA must exercise its discretionary authority once again if Petitioner is statutorily eligible for a § 1227(a)(1)(H) waiver, we will now address Petitioner's statutory eligibility.  First, we note that we have jurisdiction to review whether an individual is statutorily eligible for a waiver under § 1227(a)(1)(H), pursuant to 8 U.S.C. § 1252(a)(2)(D). *See Singh*, 451 F.3d at 410 (holding that the court had jurisdiction to review the statutory eligibility elements of § 1227(a)(1)(H)).  Although waivers under this section are ultimately left to the discretion of the Attorney General, "we may review the non-discretionary decisions that underlie determinations that are ultimately discretionary." *Billeke-Tolosa v. Ashcroft*, 385 F.3d 708, 711 (6th Cir. 2004).  The jurisdiction-stripping provision in 8 U.S.C. § 1252(a)(2)(B)(ii) does "not extend to non-discretionary decisions upon which the discretionary decision is predicated." *Id.*

> Section 1227(a)(1)(H) provides, in relevant part, as follows:
>
> The provisions of this paragraph relating to the removal of aliens within the United States on the ground that they were inadmissible at the time of admission as aliens described in section 1182(a)(6)(C)(i) of this title [which renders inadmissible aliens who procure a visa or admission by "fraud or willfully misrepresenting a material fact"], whether willful or innocent, may, in the discretion of the Attorney General, be waived for any alien . . . who—
>
>> (i)(I) is the spouse, parent, son, or daughter, of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence; and
>>
>> (II) was in possession of an immigrant visa or equivalent document and was otherwise admissible to the United States at the time of such admission except for those grounds of inadmissibility specified under paragraphs (5)(A) and (7)(A) of section 1182(a) of this title which were a direct result of that fraud or misrepresentation.
>
> . . . .
>
> A waiver of removal for fraud or misrepresentation granted under this subparagraph shall also operate to waive removal based on the grounds of inadmissibility directly resulting from such fraud or misrepresentation.

Thus, to be eligible for the waiver, Petitioner must (among other things) have been "in possession of an immigrant visa or equivalent document" at the time of his admission into the U.S. Here, there are two separate "admissions" that are relevant. First, Petitioner was admitted to the U.S. when he initially came to the country in January 2014. Second, another admission occurred when he adjusted his status to that of a lawful permanent resident. *See Matter of Agour*, 26 I. & N. Dec. 566, 570 (BIA 2015).

The BIA concluded that Petitioner's inadmissibility at the time of his first admission could not be waived because, at the time of that admission, he was not in possession of an immigrant visa or equivalent document. The BIA reasoned that, when he was first admitted, Petitioner did not have an "immigrant visa" because he had only a fiancé visa, and aliens seeking to enter the country on fiancé visas are classified as nonimmigrants. *See* 8 U.S.C. § 1101(a)(15)(K). Nor, in the BIA's view, was Petitioner's fiancé visa an "equivalent document" to an immigrant visa because an alien who enters on a fiancé visa is not automatically entitled to adjust his status, but rather may apply to do so only after taking the additional step of marrying the U.S. citizen petitioner within ninety days of his entry. *See generally Choin v. Mukasey*, 537 F.3d 1116, 1118 (9th Cir. 2008).

Petitioner concedes that fiancé visas are not immigrant visas, but argues that they are an equivalent because the BIA treats fiancé visa holders like immigrant visa holders in some ways. The BIA is correct, however, that the additional hurdles a fiancé visa holder must clear in order to become a lawful permanent resident distinguish fiancé visas from immigrant visas. Thus, as the Ninth Circuit has held, *see Caddali v. INS*, 975 F.2d 1428, 1431 (9th Cir. 1992), a fiancé visa is not "equivalent" to an immigrant visa. Moreover, even if this question of statutory interpretation were fairly debatable, we would still give *Chevron* deference to the BIA's reasonable answer. *See Reyes v. Lynch*, 835 F.3d 556, 559 (6th Cir. 2016).

Petitioner (and the IJ) advance a more complicated alternative argument: they say that, even if Petitioner did not actually have an immigrant visa or equivalent document upon his *first* admission into the country, he nonetheless met all the requirements for the waiver at the time of his *second* admission (i.e., his adjustment of status). It is true that he is deemed to have had an immigrant visa at the time of the second admission under the rule of *Agour*, 26 I. & N. Dec. at

570. Petitioner argues that, having qualified for the waiver at the time of his second admission, he can use the waiver to cure his inadmissibility at the time of his first admission as well.

To make this argument, Petitioner relies on our decision in *Avila-Anguiano v. Holder*, 689 F.3d 566 (6th Cir. 2012). But that case is different, as the BIA explicitly reasoned. Avila-Anguiano, a Mexican national, attempted to enter the United States on two separate occasions. When he first arrived at the border in 1991, he falsely claimed to be a U.S. citizen. Border inspectors, however, did not fall for the ruse, and he was not only refused entry, but also convicted of making a false claim of citizenship. *Id.* at 567. When he entered the United States again in 1993, he was granted a visa after failing to disclose his earlier conviction. *Id.* at 567–68. The Government later sought to remove him, contending that he was inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i) because he had procured a visa "by fraud or willfully misrepresenting a material fact." The Government pointed to two different misrepresentations that it claimed rendered Avila-Anguiano removable: (1) his 1991 false claim of citizenship, and (2) his 1993 failure to disclose his conviction for the prior fraud. *Id.* at 568. Avila-Anguiano sought a waiver of removability under § 1227(a)(1)(H). The Government conceded that he met the statutory requirements for the waiver with respect to the 1993 misrepresentation, but argued that the earlier 1991 misrepresentation could not be waived because § 1227(a)(1)(H) permitted waiver of misrepresentations made only at the time of the alien's admission to the United States, and he had not been admitted in 1991. *Id.*

We held that the waiver could cure all the misrepresentations that rendered Avila-Anguiano inadmissible at the time of his sole admission in 1993, including his earlier 1991 misrepresentation. *Id.* at 569. Crucially, however, we focused only on whether he met the eligibility requirements for the waiver with respect to his single admission in 1993, not whether he also met those requirements at the time he made his first misrepresentation in 1991. *See id.* at 568. The situation in *Avila-Anguiano* is distinguishable from the facts of this case because here Petitioner was admitted to the United States twice. Thus, although we held in *Avila-Anguiano* that two misrepresentations may be waived when they each render an alien inadmissible for purposes of the *same admission*, that case did not answer the question posed here: whether a

waiver of inadmissibility with respect to one admission may be used to cure inadmissibility at the time of *another admission*.

The BIA answered this question in the negative, concluding that "the same fraud or misrepresentation may be waived for two separate 'admissions' only if 'the other requirements of [§ 1227(a)(1)(H)] are met'" (quoting *Avila-Anguiano*, 689 F.3d at 569). So far as it goes, we find the Board's analysis sound. Whereas the Government contended in *Avila-Anguiano* that the petitioner was ineligible for a waiver based on a single admission and two connected misrepresentations, here, the Government argues that two separate admissions (Petitioner's initial entry into the country and his adjustment of status) preclude him from obtaining a waiver because of misrepresentations that he made during each admission. Although Petitioner is eligible for a waiver of removal based on his adjustment of status, argues the Government, he is ineligible for a second standalone waiver of removal based on his initial entry into the United States because he lacked "an immigrant visa or equivalent document" at that time. *See* 8 U.S.C. § 1227(a)(1)(H)(i)(II).

The BIA's analysis, however, omits any discussion of the final paragraph of § 1227(a)(1)(H), which we conclude is the dispositive component of the provision in this case. Petitioner persuasively argues that the final paragraph prevents his misrepresentation about his passport's origins during his initial entry from rendering him ineligible for a waiver. That is because a petitioner who is eligible for a waiver of removal is "*also*" eligible for a "waive[r] [of] removal based on the grounds of inadmissibility directly resulting from [the relevant] fraud or misrepresentation." *Id.* (emphasis added). By its express terms, § 1227(a)(1)(H) waives the grounds of inadmissibility contained in 8 U.S.C. § 1182(a)(6)(C)(i), which specifies that an alien who "has procured" admission through misrepresentation is inadmissible. The provision thus contemplates circumstances where an already admitted alien seeks to cure a prior misrepresentation.

Assuming that the BIA were to grant Petitioner a waiver of removal based on his adjustment of status, the sole remaining basis for his removal would be his misrepresentation about the origins of his passport during his initial entry. In other words, he would continue to be removable only because of the legal consequences that "directly result[]" from the sole

misrepresentation at issue in this case—Petitioner's failure to notify the authorities that his passport had been acquired in a non-traditional manner. *See id.* A waiver of removal based on Petitioner's adjustment of status could therefore, on a derivative basis, also waive his removal based on the earlier misrepresentation. *See Vasquez v. Holder*, 602 F.3d 1003, 1015 (9th Cir. 2010) (holding that an alien's commission of marriage fraud in order to gain entry to the United States "result[ed] directly" in the termination of her conditional permanent residency and that her removal based on the termination of her conditional permanent residency was therefore also eligible for a waiver). Accordingly, we hold that Petitioner is statutorily eligible for a § 1227(a)(1)(H) waiver, and we will remand the case to the BIA to once again consider whether Petitioner is entitled to such a waiver as a matter of its discretion.

In doing so, we acknowledge that this is a somewhat paradoxical outcome. Had the Government initiated removal proceedings against Petitioner after he had entered the United States, but before he had adjusted his status, he would not have been eligible for a § 1227(a)(1)(H) waiver because he lacked an "immigrant visa or equivalent document" during the only admission that would have been at issue under those circumstances. *See* 8 U.S.C. § 1227(a)(1)(H)(i)(II). But because the Government did not initiate removal proceedings until after Petitioner had adjusted his status, his misrepresentation during his initial entry is not a nonwaivable barrier to the relief that he seeks. *See id.* § 1227(a)(1)(H). This paradox, however, is a product of the statute's plain text, which binds both the BIA and this court and drives the outcome of this case.

## III.

The petition for review is granted and the case is remanded to the BIA for further proceedings consistent with this opinion.

---

**DISSENT**

---

ROGERS, Circuit Judge, concurring in part and dissenting in part. I join parts I, II.A, and II.B of the court's opinion, but I respectfully dissent with respect to Parts II.C and II.D.

We have no business exercising jurisdiction to review the discretionary aspect of the BIA's denial of the § 1227(a)(1)(H) waiver, where Congress has clearly denied us such jurisdiction. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). In particular, Congress has flatly denied us jurisdiction to review the BIA's denial, in its discretion, of a waiver under § 1227(a)(1)(H), except for constitutional claims and questions of law. *See id.* § 1252(a)(2)(D). Calling the BIA's fact-bound exercise of statutory discretion a legal issue makes the question-of-law exception swallow the rule and amounts to an unwarranted grab of decisional authority. The legal question in this case, according to Petitioner, is whether the Board complied with its regulatory obligation to review the IJ's fact-finding for clear error. Only in the most technical sense can this be called a question of law. The same technical sense would make a legal issue of virtually any issue on judicial review of agency action, and thereby effectively nullify in its entirety the preclusion of judicial review that Congress enacted.

Instead, the exception in § 1252(a)(2)(D) "only permits judicial review of purely legal questions, such as constitutional and statutory construction questions." *Khozhaynova v. Holder*, 641 F.3d 187, 192 (6th Cir. 2011) (citing, and rejecting, Ninth and Second Circuit precedents). Since we first reached this interpretation of § 1252(a)(2)(D) in 2006 in *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006), we have reaffirmed it on many occasions. We explained this history in *Rais v. Holder*:

> Relying on the Second Circuit's opinion in *Chen v. U.S. Dep't of Justice*, 434 F.3d 144 (2d Cir. 2006), this court defined § 1252(a)(2)(D) to include "constitutional and statutory-construction questions, not discretionary or factual questions" in *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (2006). Thus, a petitioner cannot create jurisdiction by alleging "nothing more than a challenge to the [BIA's] discretionary and fact-finding exercises cloaked as a question of law[.]" *Abdul v. Holder*, 326 F. App'x 344, 347 (6th Cir. 2009) . . . . After this court decided *Almuhtaseb*, the Second Circuit revised *Chen* to expand its

definition of "question of law." *Chen v. U.S. Dep't of Justice* (*Chen II*), 471 F.3d 315, 326–27, 329 (2d Cir. 2006) . . . . Since *Chen II*, a circuit split has emerged over whether that term includes only issues of statutory construction and interpretation or also includes mixed questions of law and fact. . . . *This court, however, expressly has declined to expand its definition of "question of law" to include mixed questions of law and fact.* Khozhaynova v. Holder, 641 F.3d 187, 192 (6th Cir. 2011) ("We continue to maintain a more narrow interpretation of our jurisdiction . . . and limit review to constitutional or statutory interpretation claims.").

768 F.3d 453, 462 n.17 (6th Cir. 2014) (emphasis added, brackets in original). As *Rais* indicates, in *Khozhaynova*, 641 F.3d at 192, we rejected a request to apply Ninth and Second Circuit precedents that were inconsistent with *Almuhtaseb*, and instead reaffirmed *Almuhtaseb*'s narrower interpretation of § 1252(a)(2)(D). *See also Vincent v. Holder*, 632 F.3d 351, 353 (6th Cir. 2011); *Pepaj v. Mukasey*, 509 F.3d 725, 728 (6th Cir. 2007). Petitioner's attempt to characterize his challenge to the BIA's recitation of the facts as a question of law thus runs headlong into a solid wall of circuit precedent.[1] His claim—that the Board reviewed the IJ's factual findings de novo rather than for clear error—does not ask this court to construe a statute, or even the relevant regulation. Rather, it asks us to review the Board's *application* of 8 C.F.R. § 1003.1(d)(3)(i) and determine whether the BIA's factual statements differed from those made by the IJ. This we cannot do, for it presents precisely the kind of mixed question of law and fact that we have repeatedly said falls outside of § 1252(a)(2)(D)'s definition of "questions of law."

In an analogous case, we held that the exception allowing review for legal issues does not apply when the purported "legal issue" is whether one set of facts is similar to or different from the facts in agency precedent. *Ettienne v. Holder*, 659 F.3d 513, 518 (6th Cir. 2011). As we said in *Ettienne*, "this court lacks jurisdiction over claims that can be evaluated only by engaging in head-to-head comparisons between the facts of the petitioner's case and those of precedential decisions." *Id.* In *Ettienne*, the petitioner argued that the BIA had a legal obligation to comply with its own precedent requiring it to consider certain hardship factors in their totality, and that we had jurisdiction to consider whether the BIA had done so. *Id.* at 517. We held that we lacked

---

[1]Because of this binding circuit precedent, it is beside the point that some other circuits have held that the issue of the BIA's compliance with 8 C.F.R. § 1003.1(d)(3)(i) is a question of law. *See, e.g.*, *Zumel v. Lynch*, 803 F.3d 463, 476 (9th Cir. 2015); *Kabba v. Mukasey*, 530 F.3d 1239, 1245–46 (10th Cir. 2008).

jurisdiction, however, because Ettienne's challenge amounted to a request to second-guess the BIA's weighing of the factors in her particular case. *Id.* at 518. This, we concluded, was beyond the limited scope of the exception for legal questions because if the exception were so expanded, it would effectively negate Congress's command that such factual and discretionary decisions—as opposed to constitutional or legal decisions—may not be judicially reviewed.

Permitting judicial review here would open virtually all BIA factual determinations to judicial review, contrary to the clear intent of Congress. As we explained in *Almuhtaseb*, "the purpose of [§ 1252(a)(2)(D)] is to permit judicial review over those issues that were historically reviewable on habeas—constitutional and statutory-construction questions, not discretionary or factual questions." 453 F.3d at 748 (emphasis deleted) (quoting *Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 153 (2d Cir. 2006)). While any question of whether an agency determination is supported by substantial evidence or constitutes an abuse of discretion may be in some sense "legal," Congress obviously intended a narrower meaning to the term. Letting every BIA discretionary decision be reviewed as "legal" under the guise of reviewing the BIA's application of its scope of review to an IJ's factual or discretionary determinations would gut Congress's attempt in § 1252(a)(2)(D) to limit judicial review over claims that Congress has placed within the Attorney General's discretion.

Moreover, this is not a case in which the BIA has purported to apply an incorrect legal standard. In *Ettienne* we distinguished cases in which there was jurisdiction to review whether the BIA had identified the correct legal rule at all. *See* 659 F.3d at 517–18 (discussing *Figueroa v. Mukasey*, 543 F.3d 487, 496 (9th Cir. 2008), and *Perez-Roblero v. Holder*, 431 F. App'x 461, 466–68 (6th Cir. 2011)). In particular, Petitioner's case is not like *Tran v. Gonzales*, 447 F.3d 937, 943–44 (6th Cir. 2006), in which we concluded that a reviewable question of law was presented when "[t]he BIA's decision never stated the standard of review that it employed . . . and its treatment of Tran's claims d[id] not make it evident to th[e] Court what standard of review the BIA employed." Here, as in *Ettienne* (and in contrast to *Tran*), there is no doubt that the BIA identified the right legal standard. The BIA plainly stated the correct legal rule when it said in its decision that it would "review findings of fact determined by the Immigration Judge, including credibility findings, under a 'clearly erroneous' standard. 8 C.F.R. § 1001.1(d)(3)(i)."

Petitioner is therefore left to argue that the Board erred in its application of this rule to the facts found by the IJ.  But just as there was not jurisdiction in *Ettienne* to review the Board's weighing of the factors in Ettienne's case, so too here there is not jurisdiction to examine how the Board applied the correctly identified legal rule to the facts found by the IJ.

For these reasons, we lack jurisdiction to review the discretionary component of the BIA's denial of the waiver.  I need not reach the question of Petitioner's statutory eligibility for the waiver.

Finally, with respect to Part II.C, we should not play "Gotcha!" when the Government has agreed to a remand to an agency to reconsider a decision using the correct standard.  The Government's brief before this court contends that a remand is necessary to "clarify the standard [the Board] used in making its firm resettlement determination," and we may accept such a government concession to permit further consideration by the agency below.  *See Citizens Against the Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 416–17 (6th Cir. 2004).  The Board on remand should be permitted to consider the firm-resettlement issue using the proper standard, and nothing precludes us from allowing the Board to do so.